No. 47.—Wm. L. Edmondson and wife, plaintiffs in error *vs.* John H. Dyson, defendant in error.

[1.] If an estate is bequeathed to A in trust for B, during his life, with *power of appointment* in B of the fee by will, and in the event of B dying intestate, remainder in fee to the heirs at law of B ; held that B having died without exercising the power, it is void, and the limitations over take effect as though there was no such power in the will.

[2.] The rule in Shelley's case applies only where the estate to the ancestor and to the heirs is of the same kind ; it applies to *legal estates* and to *trusts executed,* but not to *trusts executory* where it is the intention of the testator that it shall not apply ; it applies to personal as well as real property. Where the testator leaves something to be done by the trustee, *as to convey,* it is an executory trust.

[3.] When property is bequeathed to A in trust for the use of B, during his natural life, with instructions to the trustee to convey to whomsoever he shall by will appoint ; and if he dies intestate, then to convey the property to the heirs at law of B absolutely, and B dies intestate ; *held* that this is an executory trust, to which the rule in Shelley's case does not apply ; and that the heirs at law of B take as purchasers, and not as heirs in course of administration.

This was a bill in equity brought by the plaintiffs in error as complainants against the defendant in Wilkes Superior Court. Judge Sayre presiding. At February Term, 1847, the defendant demurred to the bill, and his demurrer was sustained.

The case made by the bill, and the grounds of error in the decision of the Court below sustaining the demurrer, are set forth in the opinion delivered by the Supreme Court, to which the reader is referred.

Wm. Dougherty and Thos. R. R. Cobb, for the plaintiffs.

Francis H. Cone and Robert Toombs, for the defendant.

Mr. Cobb for plaintiffs, urged and relied on the following points and authorities :—

First. As to the personalty.

The rule in Shelley's case applies only to realty. *Hargrave's Law Tracts,* 552.

If it did apply to personalty, the Statute of Uses does not ; and the trust as to the personalty is necessarily executory. *Schley Dig.* 163.

If the rule in Shelley's case does not apply, then the remainder

over in the personalty is not too remote, and the heirs take as pur-
chasers.   2 *Kent Com.* 285; 5 *John. Ch. R.* 334; 1 *Bay R.* 87;
6 *Munf. R.* 455, 174; 6 *Peters R.* 78; 3 *Bibb R.* 39; 1 *Call R.*
338; 3 *Ib.* 50; *Gilmer R.* 194; *Hargrave Law Tracts,* 504, 505;
17 *Sergt. & Rawle R.* 293; 3 *Des. R.* 258; 4 *Ib.* 330; 1 *Bailey
Eq. R.* 48; 2 *Bro. C. C.* 570; *Ambler R.* 562.

The case of *Horne* vs. *Lyette,* 4 *Har. & John. R.* 431, is not law.
The decision is not of the Court of Appeals, and is virtually over-
ruled in *Dashiell* vs. *Dashiell,* 2 *Har. & Gill R.* 127.

Second.  As to the realty.

Does a use created by will under the Statute 32 *Hen. VIII.*
become executed by the Statute 27 *Hen. VIII.* passed five years
previous?   15 *Petersdorff Abr.* 171, *note; Schley Dig.* 189, *note,*
256.

The trust in Dyson to convey to the remaindermen is purely
*executory,* and the rule in Shelley's case cannot apply.   *Powell on
Devises,* 285, 286; 2 *Jarman on Wills,* 253, *et. seq.; Hill on Trus-
tees,* 333; 6 *Cruise Dig.* 337, 344; 7 *Bacon Abr.* 161, 174, 175;
1 *Bro. C. C.* 75; 2 *Saund.* 11, *note* 17; 7 *Term R.* 652; 1 *Ves. R.* 142;
2 *Term R.* 444; 7 *Ves. R.* 201, 322; 9 *Ib.* 524, 525; *Amb. R.* 93;
4 *Taunt. R.* 772; 4 *Adol. & Ellis,* 582, *(31 Eng. C. L.); 1 Barnw.
& Cres.* 336, (8 *Eng. C. L.); 1 McCord Ch. R.* 239, 240; 2 *Barn.
& Adol. R.* 564, (22 *Eng. C. L.);* 18 *Ves. R.* 395; 11 *East. R.* 458.

Messrs. Cone & Toombs for defendant, made the following
points:

First.  The legal estate in the property devised by the will of
Mrs. Rakestraw, to the defendant in error as trustee for Gainham
L. Rakestraw, vested in said Rakestraw.  2 *Jar. on Wills,* 197;
11 *East. R.* 396; 1 *Bro. Ch. C.* 64; 1 *Burrows R.* 228; 2 *Dowl. &
Ryl. R.* 36; 6 *Taunton R.* 312; 9 *Adol. & Ellis R.* 880; 1 *Bro.
Ch. C.* 67; *Sugden on Vend. and Pur.* 311, 312, 314, 319; 1 *East.
R.* 36; 12 *Ib.* 445; 4 *Taunt. R.* 472; 1 *Eq. Cases Abr.* 384.

Second.  The said devises and bequests fall within the rule in
Shelley's case, and vest a fee simple in the real estate, and an ab-
solute property in the personal estate in Gainham L. Rakestraw.
2 *Jar. on Wills,* 290; 4 *Kent's Com.* 206; *Fearne on Con. Rem.* 25;
*Preston on Estates,* 311; 1 *Kelly's R.* 97.

Third.  The rule in Shelley's case will attach, notwithstanding the
interposition of a power or other estate between the estate for life
and the limitation to the heirs.   2 *Stra. R.* 1125; *Doug. R.* 337;

*Ambler R.* 344; 5 *Barn. & Ald. R.* 510; 2 *Levinz R.* 58; 1 *Ventris R.* 225; 3 *Pr. Williams R.* 471; 5 *Durnford & East. R.* 299; 3 *East. R.* 548; 19 *Ves. R.* 170; 8 *Vin. Abr.* 262.

Fourth. Where a power is interposed between the estate for life and the limitation to the heirs, and such power is not executed, the rule in Shelley's case applies. *Sugden on Powers,* 148; 1 *Ves. R.* 174; *Fearne,* 290, 299; 4 *Term R.* 39; 4 *Kent's Com.* 318; 7 *Term R.* 478; 5 *Ves.* 478; 2 *Bro. Ch. C.* 588; 4 *Ves. R.* 636, 637, 771; 7 *Ib.* 583; 10 *Ib.* 265; 1 *Ball & Beatty R.* 53.

Fifth. Equitable estates are subject to the rule in Shelley's case in the same manner as legal estates. 2 *Jar. on Wills,* 253; 2 *Vernon R.* 670; 1 *Pr. Wms. R.* 142; 1 *Jacob & Walker R.* 559; 1 *Bro. Ch. C.* 206; 1 *Pr. Wms. R.* 35, 108; 26 *Wend. R.* 9.

Sixth. Where personal estate is bequeathed to a person for life with remainder to his heirs, either general or special, the ancestor takes the whole estate, and the remainders are void. 3 *Merivale R.* 176; 1 *Pr. Wms. R.* 142, 290; 1 *Ves. Sr. R.* 194; 1 *Term R.* 596; 19 *Ves. R.* 78; 3 *Pr. Wms. R.* 32; 2 *Brown's Ch. C.* 578; 1 *Ball & Beatty R.* 1; 2 *Vernon R.* 325; 4 *Harr. & John. R.* 431; 4 *Kent's Com.* 221, 228; *Jeremy's Eq.* 163.

Seventh. The trust to the defendant in error is not executory, but executed. 2 *Jar. on Wills* 253; 2 *Story's Eq.* 315, 316; 1 *Fonb. Eq. c.* 6, *sec.* 8, *note ; Fearne* 90; *Pr. Wms.* 32; 2 *Thomas' Coke,* 699; *Atherly on Marriage Settlements,* 93, 105; *Jacob & Walker R.* 559, 571; 7 *Ves. R.* 201; 1 *Speers Eq. R.* 356; 2 *Blackstone Com.* 268; *Hill on Trustees,* 328.

Eighth. Where property is conveyed in trust for a person having a legal capacity to dispose of property, such person becomes the absolute owner of the property. 2 *Russ. & Mylne R.* 197, 210; 18 *Ves. R.* 429; 1 *Jacob R.* 603; 4 *Simons R.* 181; 2 *Merivale R.* 482; 1 *Dev. & Bat. Eq. R.* 480.

Ninth. G. L. Rakestraw by the last clause of the will of his wife, took an absolute estate in the property, under the general power to dispose of it for his own benefit by deed.

*By the Court* — NISBET, J. delivering the opinion.

The complainants, William L. Edmondson and wife, filed their bill in the Court below, setting forth, among other things, the following facts :

Mrs. Ann S. Rakestraw, the first wife of Gainham L. Rakestraw,

by her last will and testament, devised and bequeathed to *the de-fendant, John H. Dyson, the whole of her estate, both real and per-sonal, *in trust,* for the sole and exclusive use of her husband, *Gain-ham L. Rakestraw, during his natural life ;* and directed that, at his death the trustee should convey the property so bequeathed in trust, *to such person absolutely as the said Gainham L. should by will appoint ;* and if the said Gainham L. should die intestate, then she directed the trustee *to convey the same to the heir or heirs at law of said Gainham L. absolutely.* By the next clause in the will the testatrix directs and authorizes the trustee, by and with the con-sent of her husband, said Gainham L. to sell and convey all or any portion of said property, at such time and on such terms as he may think best, and also to invest the proceeds thereof in such manner as he may think most to the interest of the said Gainham L., he first having the consent of him (said Gainham L.) thereto. Gainham L. survived the testatrix many years, and died intestate, leaving a widow (having married the second time) and one child, who inter-married with the complainant Edmondson. William L. Edmond-son and wife claim one-half the property thus bequeathed, as heirs at law of Gainham L. Rakestraw and as devisees and legatees under Mrs. Rakestraw's will. They claim as purchasers, and pray that the one-half of the estate be conveyed to them by the trustee. To this bill the defendant demurred, contending that Gainham L. Rakestraw took a fee in the realty, and an absolute property in the personalty, under the will of Mrs. Rakestraw, and that the com-plainants are not entitled as purchasers, but only as heirs in course of administration. The Court below determined in favour of the demurrer, ruling that the complainants could not take as purchas-ers under Mrs. Rakestraw's will, but were entitled only to their distributive share as heirs, in regular course of administration. To the decision of Judge Sayre the complainants excepted, and thus we have the question made before this Court. The questions grow out of the will of Mrs. Rakestraw; they involve the application or not to that instrument of the celebrated rule of property, known to the profession as the *rule in Shelley's Case,* and the intricate and greatly vexed inquiry, *what is an executory in contradistinction to an executed trust?*

These inquiries are among, if not *the most abstruse, complicated, and least understood,* of all that belong to a science abounding in subtle distinctions. The most brilliant genius, the most profound learning, and the most patient and continuous labour, have been for

centuries applied to their elucidation, with no very decidedly satisfactory result. Much has been done to make the doctrine of descents generally, and of remainders in particular, easy and intelligible; to simplify them, however, is an impossibility, they must, in the very nature of things, be always intricate and involved. The application to these subjects of *recognised* rules even is difficult. Generalization and analysis, so potent in relief against complexity as to these doctrines, have, to a great extent, failed in their power of elucidation. What learning and labour could do, has unquestionably been done, by such men as Fearne, Hargrave, Preston, Butler, Smith and Kent, and yet the doctrine of remainders, and its cognate titles, is still, to the ordinary professional inquirer, very much a maze, " a mighty maze, and all without a plan." Happy is that tribunal, charged with its administration, which can bring a case made before it to the test of some one or more clear and tangible rules. Whilst I undertake no review of many leading doctrines springing directly or indirectly out of this cause, and mooted with great ability by counsel at this bar, feeling neither willingness nor ability to glean in fields trod by the master reapers of four centuries, I congratulate myself, that when stripped of adjunct difficulties, the inquiry here may be so narrowed as to become comparatively easy. The case may be brought to a test which is direct at least.

The first thing we propose to do is, to dispose of the power [1.] of appointment in Gainham L. Rakestraw, under this will. The testatrix directed the trustee to convey the property to whomsoever he, Gainham L. might by will appoint. He died intestate, and of course without having exercised the power. The power therefore falls to the ground, or rather it is as though it had never been, or as a void power. He had the ability, during life, to defeat the remainder to his heirs at law, by appointing the fee to be conveyed to others. Not having done so, the property takes just that direction which the testatrix, anticipating such a contingency, willed it to take. By the provisions then, of the will itself, upon the death of Gainham L. Rakestraw intestate, the power of appointment became a nullity, for the will further directs the trustee, upon his death intestate, to convey the property absolutely to his heirs at law.

If, according to the argument of counsel for the defendant in error, Gainham L. Rakestraw took a fee in this property under the will, the power could not affect that fee; for the rule is, that a de-

vise of an estate generally, or indefinitely, with a power of disposition over it, carries a fee. Upon their argument, at all events he gets a fee. But, if the true construction of this will is that put upon it by the plaintiffs' counsel, to wit, that Rakestraw took only a life estate, and that the heirs at law took the fee simple in remainder as purchasers, then the power could not affect the estate of either Rakestraw or the heirs; because the rule of law again is, when an estate is given for life only, the devisee takes only an estate for life, *though* a power of disposition, or to appoint the fee by deed or will, be annexed. 4 *Kent* 318. As we believe that Rakestraw acquired a life estate and no more, under his wife's will, we think the last rule stated controls this power, if no other view taken was sufficient. We, therefore, abstract it for the future wholly from the will, except in so far as the clause in relation to it may be used as an *indicium* of intention.

Without the clause abstracted, how does this will read? As follows, to wit:

" Item 2. I will and bequeath the whole of my estate, of every nature, both real and personal, which I may own, possess, or be entitled to at my death, to my friend John H. Dyson, in trust, for the sole and exclusive use of my beloved husband, Gainham L. Rakestraw, during his natural life. And it is further my will and desire, that if the said Gainham L. Rakestraw should die intestate, that my said trustee shall convey all the property herein named to the heir or heirs at law of the said Gainham L. absolutely.

" Item 3. It is further my will and desire, that my said friend and trustee, John H. Dyson, shall have the power, and I hereby authorize him, by and with the consent of my said husband, Gainham L. Rakestraw, to sell and convey all or any portion of the property herein conveyed to him, at such time and on such terms as he may think best, and also to invest the proceeds thereof in such manner as he may think most to the interest of the said Gainham L. he first having the consent of the said Gainham L. thereto."

This is the will, with a slight verbal modification of the second item, to accommodate it to the withdrawal of the appointment clause.

[2.] In the construction of wills, the great cardinal rule is, that the intention of the testator shall govern, provided it be not unlawful, or inconsistent with the rules of law. And the intention is to be collected from the *whole* will. The control which the rules of law exert over the intention, is understood to apply to the nature

of the estate, and not alone to the construction of words. The intention cannot prevail against the rule which prohibits the entailing estates, for example. If it could prevail against the rules of law, then every man's will would be a law, and the metes and bounds of property would be subject to perpetual disturbances. 4 *Kent*, 534, 535; 3 *Peters*, 346; 2 *Atkins R.* 580; 2 *Dallas*, 244; 10 *Gill. & Johns.* 27; 1 *Fearne Con. Rem.* 185, 186, 187. *On the other hand,* the right of free disposition of property is deemed one of the most sacred appertaining to the citizen; one which the courts will guard with ceaseless vigilance.

To this end, technical rules of law are not to be applied to wills with iron rigidity, wholly irrespective of the intention of the testator. "The cases (says Mr. Fearne,) as well as principles, tell us the controlling rule of construction in wills, is, the *intention* clearly expressed or implied; to contradict this would indeed be a mockery, a denial of the import of the word *will.*" Again, this singularly able writer in commenting upon the application of the rule in Shelley's case to devises, remarks, "the application of the rule is confessedly subjected to the result of an inquiry to be decided by the ordinary rules for the interpretation of wills; this is in fact a resort in the *first instance* to the discoverable *intent* of the testator, *which is the leading principle of such interpretation.*" 1 *Fearne Con. Rem.* 185, 190.

Anterior then to the application of any rule of law to this will; anterior to the inquiry, whether according to the will and the law the complainants take as purchasers or by inheritance; anterior to the inquiry whether the intention of the testatrix in the will before us contravenes any provision or rule of law, our business is to collect and fix that intention.

The contingency, to wit, of Gainham L. Rakestraw's dying intestate, which was provided for by the testatrix, having happened, what is the nature of the estate conveyed to him, and what to the persons in remainder, or what was the *intention* of the testatrix touching the nature of these estates? We think that she intended to tie up the legal estate in the hands of her trustee; *first,* for the purpose of protecting the use of the estate to her husband during his natural life, and *second* for the purpose of conveying the whole estate absolutely to his heirs at law at his death; that the trust should then cease, and the heirs at law of Rakestraw should become a new root of inheritance from which the property, if not by them aliened or bequeathed, should descend in regular course

of administration. The object of her bounty was primarily and mainly her husband; her intention was to secure the enjoyment of the property to him during his life, against his creditors, and even against *himself;* she did not intend that he should have the power of aliening it. Such motives are common and natural. If she intended to vest a fee in him, why deposit the legal estate in a trustee? why not devise it to him at once? her benevolence to him is manifest in the power she gave him to dispose of it by will, and *only* by-will; her affectionate regard for him is expressed in the provision she makes, not for her own heirs or kindred, but for his heirs. The power of appointment does not, as we have seen, enlarge his life estate into a fee—this is the judgment of the law—it was not her will that it should. At his death intestate, the legal estate is still outstanding in the hands of the trustee; she intended it so to be, as is inferable from the fact that she does not devise the estate *directly* to his heirs at law but instructs the trustees to *convey* it to them. The limitations are perfect it is true; there is no doubt about the *nature* of the estate bequeathed to his heirs at law; yet something is necessary for the trustee to do, to wit, *convey*, before he is absolved of the trust and they can be let in to the complete enjoyment of it. Before they are admitted to the full fruition of her bounty, either the trustee must convey, or a decree in chancery must devest the legal estate. A contrary construction cannot be derived from the power with which she clothes the trustee to sell the property with *his consent*, and re-invest it for his use. His *consent* restrains and limits the power of the trustee to sell, but does not constrain him to sell at his requirement; to sell or not, Rakestraw's consent being had, is still discretionary with him; this discretion was necessary to the perfect enjoyment of the estate during his life, and to this end it was doubtless given. If there had been a sale and investment, *that* would not have altered the nature of the estate in the remaindermen; that would not have enlarged *his* estate; the limitations over would still have attached upon any and all changes in the character of the property which might have occurred. We think that the testatrix did not intend to control the descent of the property further than to the heirs of her husband; she could not have contemplated a perpetuity, for she instructs her trustee to convey *absolutely* to a class of persons, which from legal necessity must be *in esse* at the time of her husband's death—persons ascertained by the law. And when the property is conveyed, the trust is execu-

ted, the limitations are perfected, and the estate is in their hands liable to alienation by deed, to testamentary disposition, and to diffusion and descent in ordinary course of inheritance. Such we think was the intention of the testatrix, as derived from the face of the will. Does this intention conflict with any known rule of law of force in this State? Can the heirs at law take this estate as purchasers, according to this intention under the laws of Georgia? To this inquiry we now address ourselves.

There is no statute law in this State which will prevent the intention of Mrs. Rakestraw from going into effect. A good deal was said in the argument about the application to this will, of the *Statute of Uses*. We do not think it applies. The Statute 27 *Henry VIII, see Schley Dig.* 163, commonly called the *Statute of Uses*, transferred the uses into possession, by turning the interest of the *cestui que use* into a legal estate, and annihilating the intermediate estate of the *feoffee*. So that if a *feoffment* was made to A and his heirs, to the use of B and his heirs, B, the *cestui que use,* became seised of the legal estate by force of the statute. The legal estate, so soon as it passed to A, was immediately drawn out of him and transferred to B, and the use and the land became convertible terms. 4 *Kent*, 293, 294. It is to be remarked, that under the constructions given to this statute in England, the *cestui que use* takes the legal estate, according to the *quality, manner and form*, which he had in the use. If in this case the bequest had been to John H. Dyson and his heirs, in trust for the use of Rakestraw and his heirs, the statute would unite in him the possession or use, and the legal estate. There is, however, in this will a *future use* provided, and in such cases the law of executory devises may obtain. In other words, if this be an executory trust, equity will, notwithstanding the statute, carry into effect the intention of the testatrix.

It is contended with much learning and eloquence, that this will contravenes the rule of the British common law, known as the rule in *Shelley's Case.* Or, to state the proposition most favourably to the defendant in error, it is claimed that according to that rule, Rakestraw under this will, took a fee in the real estate, and an absolute property in the personalty. *Or* again, if the intention in this case was that the heirs at law should take the ultimate fee as purchasers, that intention is against the law as settled in Shelley's case, and cannot be carried into effect. The rule of law referred to is recog-

nised by the Court as of force in this State, it being a rule of the common law, as we adopted it by our Statute of 1784.

What, then, is that rule? Its operation and effect is variously stated by its numerous commentators, and no text of the law has given rise to commentaries so numerous, learned, and voluminous as this one.

In Fearne the rule is stated in the following words: "It is a rule of law, that when the ancestor, by any gift or conveyance, takes an estate of *freehold;* and in the same gift or conveyance an estate is limited, either mediately or immediately to his heirs in fee or in tail, that always in such cases, the heirs are words of limitation of the estate, and not words of purchase." 1 *Fearne* 71; 2 *Fearne*, 206. These are the terms in which the rule is declared in Shelley's case. *See* 1 *Coke R.* 93.

Mr. Preston lays it down as follows: "When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." 1 *Preston Estates*, 263, 419.

The *effect* of the rule is briefly, yet clearly, stated by chancellor Kent thus: "The rule in Shelley's case, if applied to real property, enlarges the estate for life into an inheritance, and gives to the tenant for life the capacity of a tenant in fee, by which he can defeat the entail or strict settlement intended by the party. If the rule be applied to personal property, it makes the tenant for life absolute owner, instead of being a mere usufructuary without any power over the property beyond the enjoyment of it for life." 4 *Kent*, 226.

The application of the rule to the case before us by the defendant in error is to the effect, that Rakestraw's life estate is enlarged to a fee in the realty, and to an absolute property in the personalty; and the strict settlement upon his heirs at law is defeated.

It is of great antiquity, older in fact than Shelley's case, for that is reported to have been decided upon the authority of earlier cases, some of them as early as the reign of Edward III. The grounds of it are stated to be—

First. The prevention of fraud upon feudal tenures. For when the heir came in by descent, and was under age, the Lord was entitled to the grand fruits of military tenure, *wardship and marriage.* But if the heir took by purchase, then the Lord could only claim the acknowledgment of a relief. This reason for it is feudal, and I have no doubt its origin was in feudal times and in feudal policy. *Hargrave's Tracts,* 501. The judges in the great case of *Perrin* vs. *Blake,* traced its origin to principles and policy deduced from feudal tenures.

Second. Mr. Justice Blackstone, in his justly admired argument in the Exchequer Chamber, in Perrin *vs.* Blake, denies that this rule took its rise from merely feudal principles, and imputes its origin and establishment to the aversion which the common law had to the inheritance being in abeyance. The inheritance, he says, was always deemed in abeyance by the ancient common law, during the pendency of a contingent remainder in fee or in tail. The same able jurist asserts that another foundation for this rule was the desire to facilitate the alienation of land, and to throw it into the track of commerce one generation sooner, by vesting the inheritance in the ancestor, and thereby giving him the power of disposition. Now this reason commends itself to my mind with greater force than any which I find in the books. To simplify conveyancing has been the tendency of the courts and the legislature of England for many years. And a further tendency of both has been to unfetter the alienation of estates, and to throw lands into the track of commerce. Such a reason as the last given by Judge Blackstone comes up, in some good degree, to the importance of the rule itself; and whether it was or not the reason upon which it was originally adopted, it is now, and particularly in this country, an excellent reason for retaining it. As a rule of property, no matter what gave rise to it, it has been recognised for many, many years, and ought not now to be disturbed.

· A *third* reason however for it, as given by Lord Mansfield in *Doe* vs. *Laming,* 2 *Burr.* 1100, was the prevention of frauds upon the specialty creditors of the ancestor. *They* would be defrauded if the heir should take as a purchaser, *because* the lands would not be assets in his hands. Be the reasons of this great canon of property what they may, I remark that it constitutes one of the exceptions to Mr. Fearne's fourth class of contingent remainders, and is irremovably stamped upon the jurisprudence of both England and America. Having thus given its origin and its mean-

ing, or effect, I proceed to the investigation, whether it applies to the limitations in this will.

In order to its application, the estate bequeathed to the ancestor, whether legal or equitable, and that to the heirs, must be of the same kind; that is, they must be both legal or both equitable. We have already determined that according to the face of this will, the legal estate is held up through all the limitations in the hands of the trustee. We consider both the estates, as equitable in their character until the legal estate is devested from the trustee by his conveyance, or by a decree in chancery; and that so far as this requirement is concerned, the rule does apply to this will.

Again, by its terms it has relation to real property alone, and the plaintiffs in error maintain that it has no application to the personal estate bequeathed in Mrs. Rakestraw's will. Chancellor Kent does not distinctly express, but he does intimate the opinion that it applies equally to personal and real property. The language of the chancellor already quoted is, " If the rule be applied to real property," &c.; " and *if* it be applied to *personal property*, it makes the tenant for life absolute owner instead of being a mere usufructuary," &c. The meaning of which seems to me to be, that it is applicable alike to both species of property, and that the hypothetical *if* refers to the effect which follows its application in either case, rather than expresses a doubt of its applicability. 4 *Kent*, 226. In *Horne* vs. *Lyeth*, 4 *Har. & John. R.* 431, the application of the rule to chattels, is distinctly admitted by Chief Justice Dorsey, and in commenting upon this case, Chancellor Kent it would seem, gives his sanction to that proposition in these words, " In Horne *vs.* Lyeth, the rule under all its modifications and exceptions, was *learnedly and accurately expounded.*" If limitations of personalty are made, which if made of realty would create an estate tail, inasmuch as personalty is not descendible according to the law of real estate, it is a rule of the common law originating in necessity, that they would vest an absolute property in the personalty. *Jeremy*, 63; 2 *Fearne*, 307; 3 *Vesey*, 99; 9 *Yerger*, 209. If then this be a case, where as to the realty the Shelley rule applies, we hold that it also applies to the personalty; if not, then the rule which would give the realty to the plaintiffs in error as purchasers, will also give them the personalty in the same character. The doctrine of executory trusts applies to personal property as well as to realty.

The rule I am considerimg applies to *legal estates*, and to *executed trusts;* and it does not apply to *trusts executory*, where the testator plainly intimates an intention that it shall not apply. That it does not apply to executory trusts, see 4 *Kent Com.* 217 ; 1 *Maddock Ch.* 560; 6 *Paige Ch. R.* 513.

This is not a legal estate. The real question is, whether it be an executory or an executed trust ? This was the question upon which counsel on both sides rested the cause. Upon this point the case turned in the judgment of the Court below, whose opinion comes to us with the record. Judge Sayre admits, that if it be an *executory trust*, the Shelley rule does not apply and his decision was wrong. Upon the assumption that it is not, the conclusion to which that upright and really able judge arrived is unquestionably right. Having disposed, without lingering upon them, of all the preliminary questions, I am pleased to find that the case is so far simplified as to depend upon this single issue, which it is to be hoped may be subjected to a test if, as I said before, not easy, yet direct.

Courts of equity, in a long struggle against the strict enforcement of this rule of property, have by numerous adjudications softened its severity in favour of the *intention*, in case of marriage articles and executory devises, or trusts executory created by will. " The court of chancery (says Fearne) indeed, has not considered itself tied up to an implicit observance of the same rule, in respect to those limitations which are the immediate objects of that court's jurisdiction. I mean limitations which do not include or carry the legal estate. In the decreeing the execution of marriage articles, and in the construction of trust estates, of some descriptions at least, that court regards the end and consideration of the settlement, and *the intent* of the trusts, beyond the legal operation of the words in which the articles of the trusts are expressed." 1 *Fearne*, 90.

For cases illustrating this salutary interference of courts of chancery in case of marriage articles, see *Trevor* vs. *Trevor*, 1 *Eq. Ab.* 387 ; *Streatfield* vs. *Streatfield, Cas. Temp. Talb.* 176 ; *Cusack* vs. *Cusack*, 1 *Brown Cas. Par.* 470; *Honor* vs. *Honor*, 1 *P. Wms. R.* 123; 2 *Vesey, Sr. R.* 358; *Green* vs. *Elkins*, 2 *Atk. R.* 473; *Highway et al.* vs. *Banner et al.* 1 *Brow. Ch. Cases*, 584; *Chambers* vs. *Chambers, Fitz. Gibb. R.* 127; *Howel* vs. *Howel*, 2 *Vesey, Sr. R.* 358; 2 *Vern. R.* 658; 1 *P. Wms. R.* 123; *Gill. Eq. R.* 113; 2 *P. Wms. R.* 349; 3 *Atk. R.* 291; 2 *Vern. R.* 670.

In decreeing the execution of *executory trusts*, the court of chan-

cery has departed from what would be the legal operation of the words limiting the trust, when applied to legal estates. The interference of equity in case of marriage articles and *executory trusts* proceeds upon the same ground. 4 *Kent,* 217, 218. Thus we see that the exemption of *executory trusts* from the operation of the rule in Shelley's case, is established upon abundant authority. To show *that* perhaps was unnecessary.

[3.] " There is a settled distinction between trusts *executed* and *executory.* In the latter, *something is left to be done; some conveyance thereafter to be made.*" 4 *Kent,* 218; 1 *Fearne,* 136. This *something to be done,* is the grand criterion for a correct determination whether a trust, is or not, executory. What those things are which the testator leaves to be done and the effect of them, are the pivots upon which this discussion turns. It is argued with great force, that if the *limitations are perfect,* if the *character of the estates is ascertained,* the trust is executed. That the something *left to be done* has no reference to any mere act of conveyancing which might be necessary to effectuate limitations which the testator has fully declared, but that the trust is executory only where the limitations themselves are not defined, where the estates are not ascertained, and in cases where the testator only leaves loose statements, or notes of his intention, requiring careful and responsible deeds, or other instruments, to be by the trustee executed, which in themselves create and define estates, or which require a decree of chancery to mould the estates according to such loose memoranda. That it is immaterial whether the limitations are legal or equitable; that is whether the estate in the devisee may be asserted at law, or a decree in chancery be necessary to its perfect enjoyment, if the *limitations are complete, and* there is no doubt about the quantity or quality of the estate. I do not deny, but upon principle, it is hard to escape from the conclusiveness of this reasoning. It is difficult to see any reason why an estate to A in trust to B for life, with remainder to the heirs of B is an *executed trust,* and an estate to A in trust to B for life with remainder in fee, *to be conveyed* to the heirs of B is an *executory trust.* In both cases the intention of the testator is the same, the estates limited are the same. The only difference is found in the fact that in the first case the testator is his own conveyancer, and the heirs take directly, and in the second he makes his trustee his conveyancer, and the heirs take through his deed. The thing to be done in the last case, to wit, convey, neither restricts nor en-

larges the estate to the heirs. And yet the authorities as we shall see, make this very act of *conveying*, the test, or one of the principal tests, of an executory trust.

. Thus Chancellor Kent defines the characteristics of an executory trust: " When the testator devises the legal estate, he takes upon himself to order the limitations, and the rules of law will control them. But when the will or settlement is in the light of a set of instructions merely for the *purpose of a conveyance to be made by the directions of chancery*, a court of equity will follow the instructions and execute the trust in conformity with the instructions." 4 *Kent*, 218. Again: " It is settled that the same construction ought to be put upon, and the same rule of law applied to, words of limitation in cases of trusts and of legal estates, except where the limitations were imperfect and *something was left to be done by the trustee*, or in other words, except the trust was executory and not a trust executed." 4 *Kent*, 219. Jarman on Wills, and Hill on Trustees, make an executory trust to depend upon *something to be done by the trustee*, and the latter writer instances that something to be, *a conveyance. Jarm. Wills*, 252; *Hill Trustees*, 333.

I should remark as explanatory of some of the authorities, that the rule settled is the same, whether the act to be done is directed to be done by the trustee, or is left to a court of ·chancery. To this intent, the agency of the court and of the trustee is the same. And this is a convenient place to remark, that if the property in this case had been left in trust to John H. Dyson, to Rakestraw for life, and remainder in fee to his heirs at law, there could be no doubt about its then being an *executed* trust and the rule in Shelley's case would apply to and control it. But such are not the terms of limitation; the property is left in trust with Dyson *to be conveyed* to the heirs at law of Rakestraw. Now here is something left to be done by the trustee, and *that something is a conveyance*, which brings the case to that direct test to which I have before referred, to wit, the rule in Shelley's case not being applicable to executory trusts; and whether a trust be executed or executory, depending upon something being left to be done by the trustee, and that thing to be done, being in this case, *a conveyance; does the direction to convey make this an executory trust?* I have not found in the laborious investigation which I have been compelled to give this subject, a single case where a conveyance was required to be made, however merely formal it might appear to be,

41

which has been determined to be an executed trust. On the contrary, there are many cases where such conveyance has been required that have been held executory trusts. In addition to the elementary authorities already cited, I shall now refer to some adjudicated cases, which I conceive sustain the judgment of this court.

In the case of *The Earl of Stamford* vs. *Sir John Hobart*, 1 *Brown Parl. Cas.* 288, the question of executory trust or not, was made, and determined in the affirmative; and so determined upon the ground that the completion of the trusts required a conveyance. The case was carried to the House of Lords, and the decision there confirmed. I cannot better present the view taken of this case than by transcribing Mr. Fearne's commentary upon it. "The chancellor, (says he,) introduced his decree by declaring that, in matters executory, as in case of articles, or a will directing a conveyance, &c. the court would order the conveyance to be made as would best answer the intent. And the argument in support of that decree in the House of Lords, refers to the practice of courts of equity upon executory articles, in prospect of future conveyance to be afterwards made, and the presumed ground for extending it to the case of a will, where the same was only executory by a conveyance to be made. Hence we understand that by executory trusts in wills were meant those where, as in articles, the completion of them is referred to *a conveyance or settlement*, directed to be made by the testator in contradistinction to those trusts in which no such executory medium is referred to." This case is not one of those in which the rule in Shelley's case was excluded, because the final limitation was preceded by a term of years, and not by a life estate; yet it is high authority for the position we take, that a direction *to convey* makes an executory trust. From the case itself Fearne infers what is meant by executory trusts in wills; and what is his conclusion? why that by executory trusts in wills is meant, those *where the completion of them is referred to a conveyance or settlement directed to be made by the testator, in contradistinction to those trusts in which no such executory medium is referred to.* Is not the test, here recognised, *the conveyance?* I need not pause to apply this authority to the case before this Court. The application is so easy that any one can make it. In *Papillon* vs. *Voice*, 2 *Pr. Wms.* 471, the same view is taken of an executory trust. This case of *Papillon* vs. *Voice* is selected by Chancellor Kent to illustrate the difference between a trust *executed* and *executory*. 4 *Kent* 219, *note*.

In *Glenarky* vs. *Bossville, Cas. Temp. Talb.* 3, Lord Talbot said: "In cases of trusts executed, or immediate devises, the construction ought to be the same, for there the testator did not suppose any other conveyance would be made. But in executory trusts he left something to be done, the trusts to be executed in a more careful and accurate manner."

In *Bagshaw* vs. *Spencer, Collectanea Juridica.* 378, the Master of the Rolls said: "That in Lord Glenarky *vs.* Bossville, and Roberts *vs.* Dixwell, the lands were devised to trustees *to convey*, which made it *executory*." Here we find the distinction between trusts immediately declared and trusts to be raised in *future by a conveyance*, recognised as the distinction between trusts *executed* and *executory*. 1 *Fearne*, 139.

In *Austin* vs. *Taylor, Ambl. R.* 378, the distinction is plainly stated, and still is the same. The Lord Keeper is reported as saying, "that in the case of imperfect trusts only, that court could make a different construction from a legal limitation, that in the principal case there was no reference to trustees, &c. *Nothing was left to them to be done,* but to buy the land, the testator had declared the uses of the land when purchased, and he did not believe the testator intended the trustees should make a conveyance of it. That in Papillon *vs.* Voice, the trustee was directed to convey and settle. The true guide was, that where the assistance of the trustees, which was ultimately the assistance of the court, was prayed in aid to complete a limitation—in that case the limitation in the will not being complete—it was sufficient declaration of the testator's intentions that the court should model the limitations," &c. In concluding his survey of the English cases upon this subject, Mr. Fearne remarks as follows: "thus appears to rest the distinction between trusts executed and executory, or those where the trusts are *directly and wholly declared* by the testator to attach on the *lands immediately* under the will itself, and those which are only directory, or prescribe the intended limitations of some future conveyance or settlement directed to be made by the will, for the effectuating them. A distinction which has run with a pretty strong current though the several cases affording subject matter for its application." 1 *Fearne*, 143. I quote freely from Fearne, because his authority is established in all the courts of Great Britain and America, and because his treatise on remainders is the fountain from which spring all the streams of later learning. Let us pause here for one moment to inquire whether the trust to the heirs at law of Gainham L. Rakestraw, is *wholly*

declared under this will ? Is the trust to them *wholly* declared if they cannot *immediately* take under the will itself ? We think it is not. They do not take *immediately* under the will; if they did they could bring trover and ejectment for the property. They take *mediately* under the will and *immediately* under a conveyance from John H. Dyson the trustee, whether executed voluntarily, or in obedience to a decree in chancery. If they take immediately under the will why are these complainants here ? why this bill in chancery ? Something has been left to be done by the trustee, he refuses to do it, and because of that refusal they invoke the aid of this court. Is not that trust executory, where the refusal of the trustee to do an act which he is instructed by the testatrix to do, arrests the intent of the testatrix and withholds her bounty from its appointed objects ? The proposition is self-evident. I shall refer to only one more decision before I bring this opinion to a close, and that is the decision made in New York in Wood *vs.* Burnham by Chancellor Walworth; I refer to this case with confidence, as in its facts, reasoning, and judgment, sustaining the view we have taken in the case before us. The chancellor reviews learnedly the cases, particularly with reference to the inquiry what makes an executory trust, and concludes with these words : "The principle must therefore be considered as settled, that wherever there is an executory trust to be carried into effect by *a conveyance from the trustees,* if it is apparent from the instrument creating the trust that the testator or donor intended that the first taker should have a life estate only, and that his heirs should take a remainder in fee as purchasers, this court will direct such a conveyance to be made as will most effectually carry into effect such intention, so far as it can be done consistently with legal rules." 6 *Paige R.* 520.

From all of which it appears to me manifest, that courts of equity, whether with or without sufficient foundation for the act in principle, will take to themselves jurisdiction in case of wills, from the fact that the testator has directed a conveyance to be made by a trustee; will from that fact declare a trust *executory* in contradistinction to *executed;* will defeat in such a case the rule in Shelley's case in favour of the intention of the testator, by decreeing a conveyance in pursuance of his intention. It is, therefore, the opinion of this Court that these complainants are entitled to take as purchasers under Mrs. Rakestraw's will, and not as heirs in course of administration; that the Court below erred in sustaining the demurrer to the bill, and that its judgment thereon be reversed.