## 37055. RAINES et al. v. DUSKIN et al.

GREGORY, Justice.

This case arises from a petition seeking construction of certain provisions of the will of Theodosia Stewart Griggs (hereinafter "Mrs. Griggs") who died testate on December 7, 1940, and of the will of her daughter Augusta Griggs Raines (hereinafter "Mrs. Raines") who died testate on November 15, 1977.

Items 4, 5, 6, 7, 8 and 9 of the will of Mrs. Griggs provide:

(Item 4)

"I will, bequeath and devise to Edgar Hollingsworth the Home located on Seventh Avenue, in Dawson, Terrell County, Georgia, in which he now lives with his second wife, Gladys Griggs Hollingsworth, for his lifetime, with the remainder to my Grand-daughter, Nancy Stewart Griggs, the only daughter of my beloved son, Daniel Stewart Griggs and Gladys Griggs Hollingsworth."

(Item 5)

"I will, bequeath and devise all of my personal effects to my daughter Augusta Griggs Raines and my Grand-daughter, Theodosia Hollingsworth Duskin."

### (Item 6)

"I will, bequeath and devise all of my farm lands located in Terrell and Randolph Counties, State of Georgia, and all personal property located thereon, including cattle, stock, farm implements and tools, except as is hereinafter provided, into three equal parts; one-third to my daughter, Augusta Griggs Raines; one-third to Theodosia Hollingsworth Duskin and her bodily heirs; one-third to Edgar Hollingsworth, for his lifetime, but charged with the maintenance, support and education of his [step] daughter, Nancy Stewart Griggs, during his lifetime, with the remainder to Nancy Stewart Griggs, my Grand-daughter. I specifically bequeath and devise the Old Home Place or Residence, where I was born, together with all appurtenances thereon, located on the Old Stewart Place in Randolph County, Georgia, to Augusta Griggs Raines and Theodosia Hollingsworth Duskin, the same to be charged to their one-third pro rata share in the division of my farm lands. I will and bequeath that the Stewart Place in Randolph County, Georgia, containing Three Thousand (3,000) acres of land, more or less not be divided until the lien or indebtedness, which is now on this land, be paid off in full and satisfied."

### (Item 7)

"I will, bequeath, and devise the Stewart Building on the South side of Main Street, and at the intersection of Main and Lee Streets, in Dawson, Terrell County, Georgia, to my daughter, Augusta Griggs Raines and Theodosia Hollingsworth Duskin, jointly."

### (Item 8)

"I will, bequeath and devise One (1) Brick Building, located on the North Side of Lee Street, in Dawson, Terrell County, Georgia, a part of the lower floor of said building now occupied by E. J. Pace, and the upper floor of which is now occupied by Dr. Steve P. Kenyon, to Edgar Hollingsworth, for and during his lifetime, with remainder to Nancy Stewart Griggs, my Grand-daughter."

### (Item 9)

"I will and desire, that if any of my legatees die without leaving bodily heirs, that their property revert to my estate, to be equally divided between the other legatees named in this my will, or their representatives."

In 1941, the Terrell County Farmlands referred to in Item 6 of Mrs. Griggs' will were sold in order to pay the outstanding debts of her estate. In 1943 the Randolph County property referred to in Item 6 of the will was partitioned, with approximately one-third awarded to Edgar Hollingsworth and Nancy Stewart Griggs, and approximately two-thirds awarded to Augusta Griggs Raines and Theodosia Hollingsworth Duskin, jointly.

Mrs. Raines died in November of 1977, survived by her son, James G. Raines, and by Theodosia Hollingsworth Duskin and her two sons. Item 16 of Mrs. Raines' will reads as follows:

"I will, bequeath, and devise it to be my will and desire that Mrs. Theodosia H. Duskin and her sons J. W. Duskin, Jr. and E. [W.] Duskin, shall have in fee simple title that part of the property which I have had that was the property of my mother, Mrs. Theodosia Stewart Griggs, consisting of: (a) the farm in Randolph County, Georgia, and (b) the part of the brick building and lot located at the southeast corner of Main Street and Lee Street in Dawson, Georgia, a part of which is now as of this date occupied by the Dawson Pharmacy; and I request and direct that my son, James Griggs Raines, if in life at the time of my death, carry out and perfect my will and desire that Mrs. Theodosia H. Duskin and her sons, J. W. Duskin, Jr. and E. [W.] Duskin, shall have the fee simple title to the property described and set forth in this Item 16 of this my Last Will And Testament."

Mrs. Raines' will also provided that the residue should go to her son, James G. Raines, if living at her death; and provided that he be named executor if living at her death, and if not, or if he refused to serve, that Theodosia H. Duskin be named executrix.

James G. Raines (hereinafter "appellant") qualified as executor and is now engaged in the administration of Mrs. Raines' estate.

Appellant takes the position that the will of his grandmother, Mrs. Griggs, had conveyed to his mother, Mrs. Raines, only a life estate in the property referred to in Items 6 and 7 of the Griggs' will and in Item 16 of the Raines' will and that this property (hereinafter "disputed property") was not part of his mother's estate, but passed to him as a remainderman by the Griggs' will.

Theodosia Hollingworth Duskin and her two sons (hereinafter "appellees") contend that the Griggs' will conveyed the disputed property to Mrs. Raines subject to defeasance should Mrs. Raines die without leaving bodily heirs. Since Mrs. Raines died leaving a bodily heir the defeasible fee was converted into a fee simple, and thus the disputed property *was* part of Mrs. Raines' estate and passed to appellees under Item 16 of her will.

Aside from the nature of the estate originally conveyed to Mrs. Raines, an additional issue presented below was whether or not the language of Item 16 of the Raines' will was precatory in nature, and, in that connection, whether or not a devise was intended. We first address the construction of the Griggs' will.

(1) All parties concede that the conveyances to Mrs. Raines in Items 6 and 7 of the Griggs' will were limited by the provisions of Item 9 of that will.

Appellant's contention that Mrs. Raines enjoyed only a life estate in the disputed property is based primarily on that portion of Code Ann. § 85-505 which states:

"Limitations which, by the English rules of construction, would create an estate tail by implication, shall give a life estate to the first taker, with remainder over in fee to his children and their descendants, as above provided; and if none is living at the time of his death, remainder over in fee to the beneficiaries intended by the maker of the instrument."

Appellees contend that because of certain language in Code Ann. § 85-506, the above quoted portion of § 85-505 will never be reached, and that the Georgia Supreme Court has, in every instance in which the issue was before it, held that language such as is contained in Item 9 of the Griggs' will conveys a defeasible fee.

Appellant responds that in none of those cases did the Georgia Supreme Court consider Sections 85-505 and 85-506 in their "unitary context," and that this is a case of first impression in this state.

These code sections and the issues raised by them in this case can be understood only in light of historical events dating back to the thirteenth century.

Our present law of real property had its origins in the feudal system. Originally, land was granted by the lord as compensation for personal services, and the grant was for life only. As the law evolved, some conveyances extended beyond the life of the original grantee, and a conveyance to "A and his heirs" passed a fee simple estate, "heirs" becoming a word of limitation describing the nature of the estate conveyed. By the thirteenth century, the owner of an estate in fee simple had acquired a substantially free power of alienation.

The great landowners, for various reasons having to do with the nature of the feudal system as it then existed, wanted to be able to convey a fee restricted to the lineal descendants of a grantee. Conveyances began to appear with the words of limitation narrower than "heirs," such as "to A and the heirs of his body." By 1250, the English courts had judicially construed such words to convey a "fee simple conditional." The result of this construction was that as soon as such a grantee had any issue born, he could convey his estate in fee simple, which he usually did to prevent any possibility of a later reversion, afterwards repurchasing the land to hold it in fee simple absolute. 1 Tiffany, Law of Real Property, § 34 (3rd Ed. 1939). Redfearn, Wills and Administration in Georgia, § 170, p. 445 (3rd Ed. 1965).

The feudal landowners were dissatisfied with the court's bias in favor of freedom of alienation, and in response to their desires the Statute of Westminster II (also known as the Statute De Donis

Conditionalibus) was passed in 1285.

This statute provided, ". . . that the will of the giver, according to the form in the deed of gift manifestly expressed shall be from henceforth observed, so that they to whom the land was given under such condition shall have no power to aliene the land so given, but that it shall remain unto the issue of them to whom it was given after their death or shall revert unto the giver and his heirs if issue fail either by reason that there is no issue at all, or if any issue be, it fail by death, the heir of such issue failing." 2 Powell on Real Property, § 193, p. 63 (Rev. Ed. 1977).

Following the enactment of this statute, a conveyance "to A and the heirs of his body" created an estate tail, which, after A's death existed only so long as he had lineal descendants.[1] Less formal language would convey an estate tail (for example, "to A and his issue," issue being a word of limitation) depending on whether the words were words of limitation or words of purchase; and if words of limitation, whether the intention of the grantor was that the estate should descend only to lineal heirs to the exclusion of collateral heirs.[2] See 2 Jarman on Wills, Ch. XLVII (What Words Create an Estate Tail) (6th Ed. 1910). Where there was an express conveyance to the lineal descendants, the conveyance was said to create an express fee tail, as distinguished from an implied fee tail or fee tail by implication.

A fee tail was implied by the English courts where a grant was made which, standing alone, would have conveyed a life estate or a fee simple, where the grant was followed by an executory limitation over upon an "indefinite" failure of issue.[3] See *Tucker v. Adams,* 14 Ga. 548, 560 (1854); *Hertz v. Abrahams,* 110 Ga. 707, 709 (36 SE 409) (1900); Jarman, supra, at pp. 1851-58. For example, a devise "to A, and if he die without issue of his body, to B" raised an estate tail by implication because "if he die without issue of his body" meant an indefinite failure of issue. *Hertz v. Abrahams,* supra, at 712 (citing Counden v. Clerke, Hob. 29a (A. D. 1613)).

---

[1] The word tail derives from the old French word "taillaire" meaning to cut or limit. There were several varieties of estates tail. An estate in fee tail general was restricted to the heirs of the body generally; an estate in fee tail male was restricted to the heirs of the body who were males, as for example, "to A and his heirs male"; an estate restricted to the heirs of the body by a certain spouse would have been a fee tail special. Powell, supra.

[2] Only real property could be entailed. *Gray v. Gray,* 20 Ga. 804, 815 (1856).

[3] "By an 'indefinite' failure of issue is meant a failure of issue which may occur at any time in the future, even in the remotest generation, and not a failure at the time

Estates tail have never been favored by the State of Georgia. The Georgia Constitution of 1777 prohibited entails of property. While this provision was omitted from the Constitution of 1798, an Act of 1799 was passed which stated simply, "Estates shall not be entailed." Acts 1799, Cobb, 167. Subsequent to the passage of this act (there being no Supreme Court at this time) the various trial courts interpreting it reached varying conclusions as to what the effect would be of an attempt to convey a fee tail; some holding such a conveyance void, others holding that a conditional fee was conveyed, and others holding that an absolute fee simple was conveyed. In response to this confusion, the Georgia legislature passed an act in 1821 which, after reciting the conflicting interpretations, went on to state that henceforth,

". . . [A]ll gifts, grants, bequests, devises and conveyances of every kind whatsoever, whether real or personal property, made in this state, and executed in such manner, or expressed in such terms, as that the same would have passed an estate tail in real property by the statute of Westminster second (commonly called the statute *de donis conditionalibus*), be held and construed to vest in the person or persons to whom the same may be made or executed, an absolute unconditional fee simple estate." Acts 1821, Cobb, at p. 169.

While the Act of 1821 arguably applied only to express estates tail, the Supreme Court of Georgia, reasoning that estates tail by implication existed only by virtue of the statute *de donis,* held that both express and implied estates tail were converted into fee simple estates by the Act of 1821. *Gray v. Gray,* 20 Ga. 804 (1856).

The will involved in *Gray* took effect upon the testator's death prior to an 1854 act which stated:

". . . That all wills, testaments and other instruments made and executed after the passage of this Act, by which property either real or personal is limited over, so as to vest in some other person or persons after the death of the first taker, upon his or her dying without heirs, or dying without issue, or dying without leaving heirs, or dying without leaving issue, or on failure of issue, or other and equivalent terms, such limitation or terms shall be held and construed to mean a definite failure of issue; that is to say, a failure of issue or heirs at the time of the death of the first taker." Acts 1854, p. 72.

By the Act of 1854, terms in limitations over which would previously have meant an indefinite failure of issue were now defined to mean a definite failure of issue, with the effect that such

---

of the death of the devisee named, or at any other fixed time." Tiffany, supra, § 44, p. 61.

limitations over would not create a fee tail by implication. *Gibson v. Hardaway,* 68 Ga. 370 (1882). Since an estate in fee simple subject to an executory limitation is by definition an estate in fee simple subject to automatic divestment in case a stated event occurs (assuming no perpetuities problem),[4] it would seem that under the Act of 1854, a conveyance "to A, but if he die without issue, to B" would give to A a defeasible fee, unless there were other language indicating a contrary intent. That is the construction given to the Act of 1854 by this court in *Shealy v. Wammock,* 115 Ga. 913 (42 SE 239) (1902).

However, the Acts of 1854 and 1821 were superseded by the enactment into positive law of the Code of 1863. Acts 1860, p. 24.[5] The real estate law section of the Code was drafted by T. R. R. Cobb, counsel for the losing party in *Gray v. Gray,* supra.[6]

Although a stated principal in the codification process was that no attempt was to be made to change or alter any well defined rule of law which had received legislative sanction, preface to the Code of 1863, p. viii; in fact the Acts of 1821 and 1854 were substantially changed when codified. Sections 2230 and 2231 of the 1863 Code read as follows:

"§ 2230. Estate's tail are prohibited and abolished in this State. Gifts or grants to one, and the heirs of his body, or his heirs male or heirs female, or his heirs by a particular person, or his children, or his issue, convey an absolute fee. Estate's tail being illegal, the law will never presume or imply such an estate. Limitations, which, by the English rules of construction, would create an estate tail by implication in this State, shall give a life estate to the first taker with remainder over in fee to his children and their descendants as above provided; and if none are living at the time of his death, remainder over in fee to the beneficiaries intended by the maker of the instrument.

"§ 2231. All limitations over after the death of the first taker, upon his dying without heirs, or dying without issue, or dying without leaving heirs or issue, or on failure of issue or other and equivalent terms, shall be construed to mean a failure of heirs or issue at the time of the death of the first taker, and shall convey the estate in the manner prescribed in section 2230."

Section 2230 was basically a codification of the Acts of 1799 and

---

[4] Powell, supra, § 189.

[5] The Codes of 1868, 1873 and 1882 were revisions of the Code of 1863 and were not adopted by the Georgia legislature.

[6] *Ewing v. Shropshire,* 80 Ga. 374, 380 (1888).

1821. However, § 2230 made no reference to the statute *de donis;* instead the second sentence of § 2230 is addressed to conveyances that would have been considered express estates tail,[7] and followed the 1821 Act as to the result of such a conveyance. The fourth sentence was entirely new in its attempt to provide for a result where a conveyance would have given rise to an implied fee tail. Section 2231 was basically a codification of the Act of 1854 except for the last clause referring to the previous Code section.

Sections 2230 and 2231 of the 1863 Code have been carried down to our present Code with very few changes. The revision of 1868 changed the final words of § 2231 from "in Section 2230" to "in the preceding section" (the preceding section no longer carrying the number 2230). The Code of 1933 added quotation marks to § 2231 (now 85-506), combined the first and third sentences of § 2230 (now 85-505) and omitted the words "in this State" which appeared twice in § 2230.

Mr. Cobb apparently intended that, subsequent to his revision, a conveyance containing a limitation of the type mentioned in what is now § 85-506 would convey a life estate with alternative contingent remainders rather than a defeasible fee. However, his attempt was not successful, primarily because §§ 85-505 and 85-506, read together, cannot support such a result.

Seven hundred years of judicial construction have not simplified the law of fee tails, and it would take many pages to summarize even briefly all the instances in which the English courts would have implied a fee tail.[8] It is clear, however, that the English courts would not have implied a fee tail from a limitation over upon a definite failure of issue within the time prescribed by the Rule Against Perpetuities. Jarman, supra, at 1854; Powell, supra, § 189, p. 58.8; *Hertz v. Abrahams,* supra, at 710.

Since a limitation of the type referred to in § 85-506 will no longer be construed to refer to an indefinite failure of issue, but must now be construed to mean a *definite* failure of issue at the death of the first taker, no fee tail can be implied from such a limitation by the English rules of construction. Thus, it follows that the portion of § 85-505 referring to implied fee tails by the English rules of

---

[7] Although, as noted in *Ewing v. Shropshire,* supra, note 6, a conveyance, "to A and his children" would not always convey an estate tail, depending upon an application of the rule in Wilde's case to determine whether or not "children" was a word of purchase or of limitation.

[8] The attempt to do so in *Hertz v. Abrahams,* supra, runs over 20 pages.

construction is inapplicable to a conveyance containing such a limitation.

Appellant argues that since neither § 85-506 nor its predecessor, the Act of 1854, were part of the English rules of construction,[9] they should not be considered in applying § 85-505. However, such a contention is inconsistent with his request that we consider § 85-505 and § 85-506 in their "unitary context," nor can we see any justification for ignoring § 85-506.[10]

It may well be, of course, that (assuming § 85-506 encompasses all instances of implied fee tails) the last sentence of § 85-505 is surplusage.[11] However, we see no way to give effect to both that sentence and § 85-506. Let us consider a typical example of the type of limitation over involved: "To A and his heirs, but if he die without issue, to B." On the face of it, A has been conveyed a fee simple subject to be defeated upon failure of issue. If, as under the old rules of construction, the failure of issue is construed to mean an indefinite failure of issue, the executory limitation is rendered void by application of the Rule against Perpetuities, leaving A with a fee

---

[9] It is interesting to note that the English Wills Act of 1837, in effect at the time of the adoption of the 1863 Georgia Code, contained a provision very similar to our Act of 1854; so at the time of the adoption of the 1863 Code, no fee tail would have been implied from limitations of the type mentioned in § 2231 of the 1863 Code, under the then prevailing English rules of construction. We do not imply that the "English rules of construction" of the 1863 Code included the Wills Act of 1837.

[10] In fact, to apply § 85-505 by ignoring Georgia rules of construction that were not part of the pre-1776 English rules of construction would require us to ignore provisions of modern Georgia law other than § 85-506. For example, a conveyance "to A" would have, by the English rules of construction, only conveyed a life estate. The Georgia rule is to the contrary. Code Ann. § 85-503. A conveyance "to B for life, remainder to his heirs" gave B a fee simple estate by the rule in Shelley's case, Powell, supra, § 182; but the rule is now contrary in Georgia. Code Ann. §§ 85-503 and 85-504. A devise "to A, but if he die without issue, then to B" was interpreted by the English courts as implying a fee tail in part by the application of the two English rules of construction just cited. Jarman, supra, at 1866.

Appellant further contends that if the Georgia legislature had meant to adopt the interpretation of § 85-505 which we are giving it, it would read: "Limitations which, by the English rules of construction, as *amended by the Georgia legislature in 1854,* would create an estate tail by implication . . ." In that connection we note that the predecessors to § 85-505 in all previous codes read: "Limitations, which, by the English rules of construction, would create an estate tail by implication *in this State* . . ." (Emphasis supplied.) While "in this State" was omitted from the 1933 Code, the explanatory note to that code instructs us that "the presumption should be that it was not the intention to change, the law as it has been construed by the courts." Explanatory note, p. XXIV, Vol. 1, of Ga. Code Annotated.

[11] We do not hold, however, that this assumption must be made, nor that the last sentence of § 85-505 is necessarily surplusage.

simple absolute; obviously, not what the grantor intended. Since the grantor obviously desired A's estate to terminate upon a failure of issue, it was easy enough for the English courts to imply a fee tail. In Georgia, however, we may not do that. There are at least two other ways to avoid enlarging the estate into a fee simple. One is to arbitrarily define such a limitation over as meaning a definite failure of issue at the time of the death of the first taker. This would eliminate the perpetuities problem and also the necessity of dealing with fee tails. The other is to arbitrarily rule that such a limitation over conveys a life estate with remainder to A's children, and if none are living at A's death, to B. If the latter method is chosen, there would be no need to define the phrase "if he die without issue" as meaning a definite failure of issue; the solution is complete without such additional definition. It follows that if we were to hold that a conveyance "'To A, but if he dies without issue, to B" conveys a life estate with remainder over, pursuant to § 85-505, we would by such construction render § 85-506 superfluous. We choose not to do so and are supported by prior decisions of this court over the past 100 years which, while not fully explaining the effect of the two code sections in their "unitary context," have consistently and clearly held that a conveyance in fee simple followed by a limitation over of the type mentioned in § 85-506 does not convey an estate according to the last sentence of § 85-505 (or its predecessors), but conveys a defeasible fee unless there is other language in the conveyance indicating a contrary intent. See *Johnson v. Johnson,* 213 Ga. 466 (99 SE2d 827) (1957); *Scranton-Lackawanna Trust Co. v. Bruen,* 206 Ga. 872 (59 SE2d 397) (1950); *Davidson v. Blackwell,* 152 Ga. 48 (108 SE 469) (1921); *Curles v. Wade & Brimberry,* 151 Ga. 142 (106 SE 1) (1920); *Slappey v. Vining,* 150 Ga. 792 (105 SE 353) (1920); *Nottingham v. McKelvey,* 149 Ga. 463 (100 SE 371) (1919); *Kinard v. Hale,* 128 Ga. 485 (57 SE 761) (1907); *Shealy v. Wammock,* 115 Ga. 913, supra; *Chewning v. Shumate,* 106 Ga. 751 (32 SE 544) (1899); *Daniel v. Daniel,* 102 Ga. 181 (28 SE 167) (1897).

We hold that where a conveyance contains a limitation over of the type mentioned in § 85-506, we will not imply from such a limitation a fee tail,[12] and the effect of such a conveyance will be determined, not by application of the last sentence of § 85-505, but from the usual rules of construction and the intent of the testator.

The limitation over contained in Item 9 of the Griggs' will

---

[12] The first sentence of § 85-505 states that "Estates tail are prohibited and abolished and the law shall not presume or imply such an estate."

contains the words "bodily heirs." "Bodily heirs" is not specifically enumerated in § 85-506. However, dying "without bodily heirs" is equivalent to dying "without issue." *Gray v. Gray,* supra, at 811; *Hertz v. Abrahams,* supra, at 711. Therefore, the limitation over in the Griggs' will is of the type mentioned in § 85-506 and since it must by application of that section be construed to mean a definite failure of issue, we will not imply from the limitation over a fee tail. However, Mrs. Griggs did not necessarily intend to convey to Mrs. Raines a defeasible fee in the disputed property. ·Mrs. Griggs may have intended to limit Mrs. Raines' estate to one for life. "[T]he intention of the testator shall govern, provided it be not unlawful or inconsistent with the rules of law." *Stanton v. Dickson,* 240 Ga. 15, 16 (239 SE2d 741) (1977) citing *Edmondson v. Dyson,* 2 Ga. 307, 312-313 (1847). "[E]very portion of the will should be considered which may aid the court in discovering the intention of the testator. *Ivey v. Davis,* 175 Ga. 607 (165 SE 605)" (1932). *Mills v. Tyus,* 195 Ga. 119, 121 (23 SE2d 259) (1942).

An examination of the Griggs' will shows that Mrs. Griggs was familiar with life estates and knew how to create them. She did so in Items 4, 6 and 8 of her will. Mrs. Griggs expressly devised a fee simple interest in the disputed property to Mrs. Raines. She then expressly limited the previous devise in the event Mrs. Raines should die without leaving bodily heirs. *Item 9* of the Griggs' will made no express provision for the *existence* of bodily heirs (although the existence of bodily heirs would necessarily prevent the reversion) and did not expressly limit the previous devises in fee simple to life estates. Should we imply an intention on the part of Mrs. Griggs to limit every prior devise in the will to a life estate? We think not. "Estates by implication are not favored . . ." Code Ann. § 85-503. "Such an inference is opposed to the clear words of the will, for the will makes full provision for two events, one or the other of which was obliged to happen, and its provisions are therefore perfectly exhaustive of all contingencies, leaving no room for inference." *Burton v. Black,* 30 Ga. 638, 642 (1850).

We are of the opinion that the Griggs' will conveyed to Mrs. Raines a fee simple interest in the disputed property subject to defeasance should she die without leaving bodily heirs. Since Mrs. Raines died leaving a bodily heir, her defeasible fee was converted to a fee simple absolute. Compare, *Reynolds v. Dolvin,* 154 Ga. 496 (114 SE 879) (1922); *McCoy v. Olive,* 168 Ga. 492 (148 SE 327) (1929).

(2) The disputed property belonged to Mrs. Raines at her death. She had the power to devise it in fee simple by her will. The only explicit reference to the disputed property is contained in Item 16 of her will. If Item 16 does not devise the property, it would

presumably pass by Item 17, as part of the residue, to appellant.

Appellant contends that the language in Item 16 of the Raines' will is precatory and does not devise any property to appellees. He points out that other devises in the will contain the words "I will, bequeath, and devise to" the legatee, while Item 16 begins, "I will, bequeath, and devise it to be my will and desire that [appellees] shall have in fee simple title" the disputed property.

Precatory words are words "whose ordinary significance imports entreaty, recommendation, or expectation rather than any mandatory direction." 80 AmJur2d 283, Wills, § 1168 (1975). Such words are to be construed in accordance with the testator's intention. Id.[13]

Item 16 of the Raines' will is divided into two parts. First, Mrs. Raines expressed her will and desire that appellees should have the disputed property in fee simple. Secondly, she requested and directed appellant, her son, to carry out and perfect her will and desire that appellees should have the disputed property.

The trial court found that the intent of Mrs. Raines was that appellees should have the disputed property and that Item 16 was written so as to convey it to appellees if Mrs. Raines owned the property and was capable of devising it, and if not, to request appellant to convey it to appellees. Such a construction is consistent with the form of Item 16. It is also consistent with the uncertainty surrounding her ownership of the property and appellant's claim that the disputed property was not Mrs. Raines' to convey, and with Item 19 of her will which, after appointing appellant executor, provides that he may sell any part of her estate except "any of the property contained in Items 4 through 16, inclusive."

We conclude that the language in Item 16 does not import entreaty, recommendation, or expectation, but expresses Mrs. Raines' intention that appellees should have the disputed property if it was hers to convey. Since it was hers to convey, Item 16 effectively devises the disputed property to appellees.

The trial court's grant of summary judgment to appellees is affirmed.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 15, 1981.

---

[13] The interpretation of such words often arises in connection with "precatory trusts." See Code Ann. § 108-103.

*W. L. Ferguson, Kilpatrick & Cody, William B. Gunter, Patrick G. Jones,* for appellants.
*Stuart Watson, Mark Gonnerman,* for appellees.
*Norman M. Shipley,* amicus curiae.