No. 72.—ELI TUCKER and REUBEN TUCKER, plaintiffs in error, *vs.* DENNIS ADAMS and others, defendants in error.

[1.] In 1806, Wm. Nelson, by deed, gave to his daughter, Elizabeth, and her husband, John Adams, for and during their existence in this world, a negro woman and her increase, to use and make use of their labor, in any manner, whatever, which they might think most conducive to their interest, except that of selling the negro, or any part of her increase, to defraud their proper heirs or his intention by that deed, which was, that at the death of her, the above-named Elizabeth, and John, the said negro woman and her increase, were to be equally divided among the lawful heirs of the body of the said Elizabeth, as their own right and property, and for their own proper use and benefit, forever, in fee simple : *Held*, that under this deed, the persons who were heirs of the body of Elizabeth Adams, at the time of her death, took as *purchasers*.

In Equity, in Sumter Superior Court. Decision on demurrer, by Judge Perkins, August Term, 1853.

In 1806, William Nelson made a deed of gift to his daughter Elizabeth and her husband, John Adams, conveying a negro woman, Judah, and her increase, "For and during their existence in this world, to use and make use of their labor, in

any manner, whatever, which they may think conducive to their interest, except that of selling said negro or any part of her increase, to defraud their proper heirs or my intention, by this deed of gift. That is, at the death of the above-named Elizabeth, my daughter, and of John, my son-in-law, then, the said negro Judah and her increase, to be equally divided among and between the lawful heirs of the body of the above-named Elizabeth, my beloved daughter, as their own right and property, and for their own proper use and benefit, forever, in fee simple".

John Adams died, leaving two children by his wife Elizabeth. These children filed their bills against Eli Tucker and Reuben Tucker, alleging that they had possession of certain of these negroes, the increase of Judah, and praying a writ of *ne exeat.* To these bills defendant demurred, on the ground that the children, under this deed, did not take as purchasers, but as heirs; and consequently, were not entitled to the relief prayed. The Court overruled the demurrers, and these decisions are assigned as error. Both causes were heard together in the Supreme Court.

E. R. BROWN, for plaintiffs in error.

S. T. BAILEY and J. W. WILSON, for defendants in error.

*By the Court.*—BENNING, J., delivering the opinion.

[1.] These two cases turn upon one and the same question. That question is, whether the defendants in error take as "*purchasers*" under the deed of Wm. Nelson.

The answer to this depends upon the answers to two other questions: 1. Did Wm. Nelson *intend* them to take as purchasers? 2. If he did, was such an intention *lawful?* The intention of every man, if not unlawful, is, as a matter of course, to have effect. This may be assumed.

Let the case be considered first, as governed by the Law of England.

What, then, was Wm. Nelson's intention?

That, by the aid of certain legal rules of interpretation, is to be drawn from the words which he used in his deed.

His deed was as follows:

"GEORGIA, MONTGOMERY COUNTY:

"Know all men by these presents, that I, William Nelson, of the State and county aforesaid, being of sound mind and memory, and without defraud to my creditors, or any other person, do, by these presents, for the natural love and affection I have for, and do have towards my beloved daughter Elizabeth, and her husband, John Adams, for and during their existence in this world, give and bequeath unto them one negro woman, named Judah, and her increase, to use and make use of their labor in any manner, whatever, which they may think most conducive to their interest, except that of selling said negro, or any part of her increase, to defraud their proper heirs, or my intention by this deed of gift; that is, at the death of the above named Elizabeth, my daughter, and John, my son-in-law, then the said negro Judah and her increase, to be equally divided among and between the lawful heirs of the body of the above named Elizabeth, my beloved daughter, as their own right and property, and for their own proper use and benefit forever, in fee simple."

What did Wm. Nelson mean by these words? There are certain rules of interpretation, which will assist us in the endeavor to answer this question. They are these:

1. "That the construction be *favorable* and as near the minds and apparent intents of the parties, as the rules of Law will admit. For the maxims of law are, that "*verba intentioni debent inservire*'; and '*benigne interpretamur chartas propter simplicitatum lairorum*'. And therefore, the construction must also be *reasonable* and agreeable to common understanding".

2. "That *quoteis in verbis nulla est ambiguitas ibi nulla expositio contra verba fienda est*, but that where the *intention* is clear, too minute a stress be not laid on the strict and precise

signification of *words.*  *Nam qui haeret in litera haeret in cortice.*"

3. " That the construction be made upon the entire deed and not merely upon disjointed parts of it. ' *Nam ex antecedentibus et consequentibus fit aptima interpretatio'.*  And therefore, that every part of it be (if possible) made to take effect; and no word but what may operate in some shape or other.  ' *Nam verba debent intelligi cura effectu est res magis valeat quam pereat.'* "

4. " That if the words will bear two senses, one agreeable to and another against Law, that sense be preferred which is most agreeable thereto."  (2 *Black. Com.* 379-80.)

Let us assume, for the present, the property mentioned in the deed, to be real property, instead of personal.

Now, from the words of the deed, and these rules of construction, it may be safely said that Wm. Nelson meant:

1. That there should be a *division* of the property.

2. That this division should take place *at the death* of his daughter and son-in-law.

3. That there should not be *repeated* divisions of the property.

4. That the persons among whom the property was to be divided, were each to take his share " *absolutely, in fee simple*".

This much, at least, is clear as to what he meant; and with this, therefore, whatever else be meant, must, if possible, be made to correspond.

Who, then, did he intend as those among whom the division of the property was to be made ?  Did he intend the lawful heirs of the body of his daughter *as heirs ?*  He certainly did not.

There cannot be a division of any sort among persons as heirs of each other, or as heirs of a common ancestor.   There can never, as a general rule, at any one time, exist more than one such person—the eldest son.  *Nemo est haeres viventis.*

Heirs of *the body* cannot, as heirs of the body, take in *fee simple.*

If such a thing as a division among heirs of the body were partially possible, it would be necessary to have a new division every time there should be a new heir. But, indeed, such a thing is not practically possible.

The words of the deed are, "At the death of Elizabeth, my daughter, and John, my son-in-law, then the said negro Judah and her increase, *to be equally divided among and between the lawful heirs of the body* of my daughter, as their own right and property, and for their own proper use and benfit, forever, in fee simple."

Who did the maker of the deed mean by "The lawful heirs of the body"? He meant the *descendants* of his daughter, who should be living at the time of the death of the daughter and son-in-law.

This meaning is consistent with those other clear and unmistakeable meanings, which we have seen him to have had; it allows every word of the deed to have effect—it is lawful.

Among such descendants, all living at once, there may be a division.

A division which needs not to be repeated.

A division in which each descendant may take his share, in fee simple.

A division which may be made at the death of the daughter.

But will the Law let the word "heirs" be used in the sense of descendants? It is not unlawful to use it in that sense. The question, therefore, becomes simply a question of intention.

Was it the intention of Wm. Nelson to use the words, heirs of the body, in the sense of the word descendants? It was.

1. The use of them, in that sense, is "agreeable to *common* understanding"; and Wm. Nelson, it is manifest from the face of the deed, was not a lawyer.

2. Besides the words "heirs of the body", the deed contains other words—"superadded words"—which show the intention to have been to use those words in this sense. "Superadded words" are such things as may show this sort of intention. This is undisputed.

What kind of "superadded words" are sufficient to produce

this effect? Any which clearly show that the takers of the gift are to take, not as heirs, not by inheritance; but as purchasers, as objects of a private bounty; which show that those takers are to take, not from the hand of the law, but from the hand of A. B., the author of the conveyance. This is the principle—the instances are various.

In the deed of Nelson, the superadded words are those in italics which follow: ·

1. "*For and during their existence in this world*".

2. "*To use in any manner whatever, except that of selling said negro, or any part of her increase.*"

3. "To defraud their proper heirs or my intention by this deed of gift, that is, *at the death* of the above named Elizabeth, my daughter, and John, my son-in-law, then the said negro Judah, and her increase, *to be equally divided among and between* the lawful heirs of the body of the above named Elizabeth, *as their own right and property, and for their own proper use and benefit forever, in fee simple.*

Are *these* superadded words sufficient to show that he used the words, "lawful heirs of the body" of his daughter, in the sense of descendants of his daughter, living at the time of her death? To vary the question, are they sufficient to take this deed out of the rule in Shelly's case?

According to decisions—according to the best elementary writings, they are.

What is the rule in Shelly's case? It is, "When the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance, an estate is limited, either mediately or immediately, to his heirs in fee or in tail, that always, in such cases, *the heirs are words of limitation of the estate, and not words of purchase*". (1 *Rep.* 104.) This is the *rule* laid down by the "defendant's counsel", in arguing the case, as the one which governed it, and probably it is the one which did govern it.

The case, itself, grew out of a gift to Edward Shelly, for life, with remainder, (after some intermediate estates for years,) "to the use of the heirs, males, of the body of the said Ed-

ward Shelly, lawfully begotten, *and of the heirs, males, of the body of such heirs, males, lawfully begotten*".

The case, therefore, was one in which there were super-added words, viz: those which I have put in italics. Yet, it was got within the rule. How? By showing these super-added words to be *consistent* with the words to which they were super-added: not by rejecting them. The process adopted was this:

"And forasmuch as the first words, viz: (heirs, males, of the body of Edward Shelly,) *include* the subsequent words, viz: (the heirs, males, of their bodies,) for every heir, male, begotten of the body of the heir, male, of Edward Shelly, is, in construction of Law, an heir, male, of the body of Edward Shelly, himself"; *for this reason the sub-words are words declaratory, and do not restrain the former words.* (1 *Rep.* 104.)

And the very *effort* to show these super-added words to be consistent with the other words, is an admission that if they were not consistent, another construction would have to be adopted.

This is admitted, too, by the fact that no attempt is made to answer the case put by Anderson—"If a man makes a feoffment, in fee, to the use of himself, for life, and after his decease, to the use of his heirs, in this case the fee-simple is executed; but in the same case, if the limitation be to the use of himself, for life, and after his decease, to the use of his heirs, and of their heirs, females, of their bodies, in this case, these words, (his heirs,) are words of purchase, and not of limitation; *for then, the subsequent words, (and of their heirs, females, of their bodies,) would be void*".

From all which, it is to be inferred that, according to the rule in Shelly's case, read by the facts of the case and the argument, if the word heirs has grafted upon it other words, which will be made "void", if the word heirs is held to be a word of limitation, that word cannot be held to be a word of limitation.

Now in this deed of Nelson's, the words "lawful heirs of the body" have grafted upon them most important words, which,

as we have seen, would be made void, if those words were held to be words of limitation.

The next case to which I refer, is that of *Doe ex Dem.* Long *vs.* Laming, decided by the King's Bench in 1760. (2 *Burr.* 1100.) A will contained several devises of the same import, to different persons: one was in these words: " I give and devise one equal, undivided fourth part, &c. unto my nephew, Martin Read, and *to the heirs of his body*, lawfully to be begotten, as well males as females, *and to their heirs and assigns, forever, to be divided equally, share and share alike, as tenants in common, and not as joint-tenants*". There was also a devise over, "for want of such issue". And the estate, to the first taker, it is to be noted, was not *said to be one for life*. It was not to Read *for life, remainder* to the heirs of his body, but to Read and the heirs of his body. The Court held Read and the other similar devisees, to take only an estate for life, and not an estate-tail. Such was the virtue of the super-added words in this case.

It is a leading case. It was fully argued, and the decision has the deliberate and careful sanction of the Chief Justice, Lord *Mansfield*.

The " super-added words" are similar to some of those in the Nelson deed—to those in that deed which require a *division* to take place among the heirs of the body of Elizabeth Adams. In fact, it may safely be said that if this case be itself Law, it gives Law to the cases growing out of Nelson's deed.

I refer, next, to Fearne's Essay on Contingent Remainders and Executory Devises. This was first published in 1772. Before Mr. Fearne's death in 1791, it had gone through several editions. A leading object of the work seems to be to defend and to extend the rule in Shelly's case. Mr. Fearne reviews all the cases which, up to his day, had been decided in reference to that rule, and he announces the result in two rules or propositions. If any case he maintains falls within either of those propositions, it is within the rule in Shelly's case; if within neither, it is not.

His rules or propositions are, first, "That the person to

claim the inheritance, after the ancestor, is to claim as heir, &c. : that is, *eo nomine* and under that description, whoever such person may be".

Second, " That the effect of the limitation is not confined to the person so first claiming, or his representatives as such, of any description, but directed equally, through all other persons successively, answering the same relative description of heirship, general or special, to the ancestor referred to, and entitling them, *eo nomine*, or in that character only". And applying these propositions, he says, it is evident that the first of the propositions excludes from the rule all those cases, among others, " wherein an amount of words subjoined the person to take, cannot take as heirs or by virtue of that description, by reason of the *distributive direction amongst several*, not constituting an heir, or as *tenants in common*, or in *some other mode irreconcilable with the course of descent*, as in *Doe ex Dem. Long vs. Laming, and others of that sort*". Whilst the latter of the propositions exclude, among others, all those cases wherein " the words of limitation, super-added to the word heirs, &c. denote a *different species* of heirs from that described by the first words, as in the case put by Anderson, in Shelly's case". The case put by Anderson was this—"If the limitation be to the use of himself, for life, (i. e. of the donor,) and after his decease, to the use of his heirs, and *of their heirs, females of their bodies*, in this case, these words (his heirs) are words of purchase and not of limitation ; for then, the subsequent words, (and of their heirs, females of their bodies,) would be void". (1 *Rep.* 95.)

At the same time that these propositions exclude such cases as those above indicated from the rule, they do not, says Mr. Fearne, exclude those cases, among others, in which the donor imposes " a restriction against alienation", or restrains " the successive heirs to estates for life", yet, " does not fix on or stop at any particular heirs, &c., *and his heirs*, nor point at a strict settlement on first and other sons, *but appears to have the whole line of heirs, &c. equally in the extent of his contemplation*". (*Fearne,* 197, '8.)

According to these propositions, the cases in hand are excluded from the rule in Shelly's case; for, first, the deed of Nelson contains a *distributive direction amongst several not constituting an heir*. It directs the property, at the death of the first taker, "*to be equally divided among and between* the lawful heirs of the body of "one of the first takers, the daughter. And by the Law of England, there can generally be but one heir at a time. So that the "several" persons meant by the plural word heirs, cannot "constitute an heir."

Second. In this deed, also, "the words of limitation super-added to the word heir, &c. denote a *different species of heirs* from that described by the first words". The species of heirs described by the first words, is "lawful heirs of the body". The species denoted by the super-added words, is heirs general. The property is to be divided among "lawful heirs of the body", "*as their own right and property, and for their own proper use and benefit, forever, in fee simple*".

If, then, Fearne's opinion is to govern, the deed of Nelson is not within the rule in Shelly's case. And it may, at least, be said of him that up to his day, if he could not get a case within that rule, no man could. It is not to be denied, however, that since his day, men have been found to do, in that respect, what he could not venture to attempt. This will appear, by some decisions made after Mr. Fearne's death, to which I shall now refer.

In 1831, the Court of King's Bench, in the case of *Doe ex Dem. Atkinson and others vs. Featherstone, 1 Barn. & Adolph.* 944, under a devise of lands by a testator, "to his son-in-law, John, and Elizabeth, John's wife, for their lives and that of the survivor, and immediately after the survivor's decease, then, to *the heirs of the body* of Elizabeth, by John, *to be equally divided among them, share and share alike*, and to John all the residue of his real and personal estate, held, that the first devisees took an estate-tail, and not a life-estate, with remainders to the children of Elizabeth, by John".

In this case, there is the "*distributive* direction" spoken of by Fearne, and there is not any limitation over on a general

failure of issue; and yet, the Court held the case to be one of entail. It differs from the two under consideration, only in this: the deed, in the two under consideration, gives the gift to the "lawful heirs of the body", "in *fee simple*"; i. e. to those heirs of the body and *to their heirs general.* In the case cited, the gift is to the heirs of the body, to be divided among them, and it stops at that. I find no other case going as far as this goes.

Is this case of authority? In my opinion it is not. In its whole length, it is not supported by a single case of which I am aware, whilst it is opposed by a long line of cases; one of which, at least, is of a later date than itself.

But is it supported by no other case? The Court which decided it, put its decision mainly, if not altogether, upon the decision of the House of Lords, *in Jesson vs. Wright*, 2 *Bligh*, 1. That decision was made between the years 1819 and 1821. Bligh, who reports the case, is, however, not within my reach, and I have to depend, for my knowledge of it, upon what I find in 2 *Jarmon on Wills*, 280. Jarmon states the case thus: "A testator devised to W certain real estate, for the term of his natural life, he keeping the buildings in tenantable repair; and after W's decease, devised the same *to the heirs of the body of W*, lawfully issuing, *in such shares* and proportions *as W*, by deed or will, *should appoint*; and for want of such appointment, then, *to the heirs of the body of W, lawfully issuing, share and share alike, as tenants in common;* and if but one *child*, the whole to such only *child;* and for want of *such* issue, then over. It was held by the Court of King's Bench, that W took an estate for life only, with remainder to his children, for life, as tenants in common. A writ of error was brought in the House of Lords, which Court, after a very full argument, *reversed* the decision".

Now, it is to be observed that this case, in one respect, differs from that of *Doe ex Dem. Atkinson vs. Featherstone;* it contains a limitation over, on failure of issue—that did not. And it is further to be observed, that in this case the decision was made to depend much, if not altogether, on this very limi-

tation. It was this alone, which seems to have decided the wavering mind of Lord *Eldon*. He says, "If the words 'children' and 'child', are to be considered as merely within the meaning of the words *heirs of the body*, which words comprehend them and other objects of the testator's bounty, (and I do not see what right I have to restrict the meaning of the word issue,) there is an end of the question". This was said in reference to the limitation over, which was "and for want of such *issue*, then over"; i. e. in his view, for want of *heirs of the body*, then over.

This limitation over had also its influence on Lord *Redsedale*, but not to so great an extent as it seems to have had on Lord *Eldon*. And these two Lords were the only two who appear to have expressed opinions on the case. It is to be inferred, therefore, that the House followed them, and that its decision was made to stand on the ground on which they had put their opinions. At least, this much may be said: that without this limitation, it is by no means certain the decision would have been as it was.

The Court, therefore, which decided *Doe ex Dem. Atkinson vs. Featherstone*, was not authorized to rest its decision, in that case, upon the decision in this, especially as in doing so it had to overrule a long line of other decisions.

Did the Court have to do this? We shall now proceed to inquire.

Let it be remembered that this case of *Doe ex D. Atkinson vs. Featherstone*, is founded upon a devise, in which the "superadded words" are "To be equally divided among them, share and share alike"; and that the effect of the decision is to make these superadded words *void*.

Now I proceed. The first case I refer to, is Shelly's case itself. In considering this case, we found it to establish the proposition, that "If the word heirs has grafted upon it other words, which will be made 'void', if the word heirs be held to be a word of limitation, that word cannot be held to be a word of limitation". Yet, *Doe ex Dem. Atkinson vs. Featherstone* makes such "grafted words" void.

The next is the case of *Doe ex Dem. Long vs. Laming.*— This has also been noticed. It is a much stronger case for an estate in tail than that of *Doe ex Dem. Atkinson vs. Featherstone.* It has not in it an express estate for life to the first taker; it has a general limitation over on failure of issue, in both of which particulars it differs from *Doe ex Dem. Atkinson vs. Featherstone.* Yet, as it had in it also "distributive words," it was held not to create an estate-tail in the first taker.

Then may come Fearne's Treatise, recognizing this very case of *Doe ex Dem. Long vs. Laming,* and laying down as the result of all his researches and reflections, two rules which condemn this case of *Doe ex Dem. Atkinson vs. Featherstone.* To these, I have already referred at length.

The next case to which I refer, is *Doe ex Dem. Chandler vs. Smith,* (7 *Durn & E.* 532) in which a testator devised his freehold lands to his daughter A., and *the heirs of her body,* lawfully to be begotten forever as tenants in common, and not as joint tenants: and in case his said daughter should happen to die before twenty-one, or without having issue on her body lawfully begotten, then over.

It is true, that in this case, the decision was that A. took an estate-tail; but the reason, and the only reason given for the decision is, that there *was a limitation over, if A. happened to die without issue.* This showed, as the Court thought, an intention on the part of the testator for the property to descend through the whole line of the heirs of the body of A. until that time became extinct. But for this limitation, therefore, the decision must have been just the reverse of what it was. No such limitation is contained in *Doe ex Dem. Atkinson vs. Featherstone.*

This decision was made by the King's Bench, in 1798, Lord Kenyon delivering the opinion.

To the same effect, are the decisions in *Doe ex Dem. Cook et al. vs. Cooper,* (1 *East.* 229) in 1801, Lord Kenyon again delivering the opinion; *Pierson vs. Vickers and Wife,* (5 *East.*) in 1804, Lord Ellenborough and others delivering opin-

ions; *Bennett vs. Earl of Tankerville*, (19 *Ves.* 170,) Sir. Wm. Grant delivering the opinion; *Doe ex dem. Cole vs. Goldsmith*, (7 *Taunt.* 209) in 1816—opinion by Gibbs, C. J.    In all of these cases, the decision was, that the first takers took estates-tail, notwithstanding "distributive words", but for the reason, that there was in each, *a limitation over, after an indefinite failure of issue.*    In *Doe ex Dem. Hallen vs. Ironmonger and others*, (3 *East.* 533) decided by the King's Bench, in 1803, Lord Ellenborough delivering the opinion of the Court, the facts were a devise to a trustee, to receive and pay rents, &c. for the maintenance of S., a *feme covert*, and the issue of her body during her life, and after her decease, upon trust, for the use of *the heirs of the body of S.*, their heirs and assigns forever, *without regard to seniority of age, or priority of birth;* and *in default of such issue*, to the use of the right heirs of the testatrix.    And Lord Ellenborough said: "All Sarah's children were intended to take together, *without regard to seniority of age, or priority of birth.    That must mean that they should take as joint-tenants*".

The next case is *Doe ex Dem. Strong vs. Goff*, in 11 *East.* 668.    This was decided in 1809, by the King's Bench, Lord Ellenborough delivering the opinion of the Court.    The facts, in brief, were a devise to the testator's daughter M., and to *the heirs of her body*, lawfully begotten or to be begotten, *as tenants in common, and not as joint-tenants;* but if such issue should depart this life before he, she or they should respectively attain their age or ages of twenty-one years, then over to the testator's son.    Upon the argument of this case, all the previous decisions, above mentioned, as well as others, were cited.    Lord Ellenborough, in delivering the opinion of the Court, among other things, says, "We have looked through the cases which have been cited, and do not feel that we shall break in upon any of them, by holding that the children of Mary Goff *took estates in common, by purchase*".

To the same effect, is *Crump D. Woolley vs. Norwood*, decided in 1817, by the Court of Common Pleas, Gibbs, C. J., delivering the opinion.    It is in 7 *Taunt.* 362.

In 1815, this Court had also certified to the Master of the Rolls, Sir Wm. Grant, an opinion to the same effect. It was in the case of *Gretton et al. vs. Harward et al.* (6 *Taunt.* 94.)

The next case is that of *Jesson vs. Wright.* To this I have referred.

The next case is that of *Doe D. Boswell vs. Harvey,* (4 *Barn. & Cress.* 610) decided by the King's Bench. In this case, it is also true, as it was in *Jesson vs. Wright,* that the Court held the first takers to take an estate-tail : but it was distinctly upon the ground of *the limitation over,* in default of issue. This case was decided in 1825.

In 1826, the Court of King's Bench, in *Right D. Short-ridge vs. Creber,* (5 *Barn. & C.* 866) a case in which a testator devised a messuage to trustees, &c., in trust, to permit his daughter J., and her assigns, to receive the rents for her life, &c. ; and after her death, he devised the same to *the heirs of the body of J., share and share alike, their heirs and assigns forever,* held that the word heirs of the body meant *children ;* and that *the child* born before the testator's death, took a vested remainder, &c.

This case is in the very teeth of the one under criticism, *Doe D. Atkinson vs. Featherstone.* In neither, is there any limitation over, upon a failure of issue.

So, in *Wilcox vs. Bellaers,* (1 *Turn. & Russ.* 491) the Master of the Rolls, Sir Thos. Plumer, first, and then the Lord Chancellor, Lord Lindhurst, afterwards, refused to hold a will which devised the testator's messuages, &c., to his son H., during his life ; then, after his decease, to such of his children, and in such shares, &c., as the said H. should appoint, and to their heirs, and for want of appointment, &c., to the heirs of the body of H., and *their heirs forever ;* and if H. should die without issue, then, immediately after his decease, to his, the testator's, daughter E., during her life ; remainder to such of her children, and in such shares as she should appoint, and in default of appointment, to the heirs of her body, *and their heirs and assigns forever",* to create an estate-tail in H.

In this case, Mr. Sugden, of counsel for the party, which in-

sisted that the words did not create an estate-tail, said, "*All* the cases in which it has been held that a person described as tenant for life, took an estate-tail, *depended on this principle, that there was a general gift over, in default of a whole class of issue, of that person*", (and *Jesson vs. Wright* was one of the cases to which he had special reference,) i. e., depended on the presence of a fact which was not present in the case under our review; *Doe D. Atkinson vs. Featherstone.* That case is the next in order of time, having been decided in 1831.

In 1833, in a case upon a marriage settlement, in which estates were limited to the wife and the husband, for their lives, with remainder to the heirs of the body of the husband on the body of the wife, and their heirs, and if more children *than one, equally to be divided amongst them, as tenants in common,* and for default of such issue, to the wife and her heirs, Vice Chancellor Shadwell, held that the husband did not take an estate-tail, but one for life only; and that the children took by purchase, as tenants in common, in fee in remainder.  (*North vs. Martin,* 6 *Simons,* 266.)

Now, in this case, it is true, the V. Chancellor says, "Here there are all the elements of a case which would call upon the Court to decide, that the first taker took an estate in tail special; but then there are the words, "*and if more children than one*", which *must be taken as interpretative of the words,* "*heirs of the body*". But, although these "interpretative" words were not *expressed,* in the case of *Doe. ex D. Atkinson vs. Featherstone,* they were *necessarily* understood. This will become apparent by reading, in connection, the words of gift in the two cases—that and this.

This case, therefore, being the later, may be considered as *overruling* the other.

There is another case, still later, which may be thought to do the same thing. It is the case of *Greenwood vs. Rothwell,* (5 *Mann. & Gran.* 628) decided by the Court of Common Pleas, in 1843. It was the case of a devise of realty to A., "For and during the natural life of the said A., and from and after his decease, unto all and every the issue of the body of

A., share and share alike, as tenants in common, and the heirs of such issue". The Court certified to the Master of the Rolls, that A. took *an estate for life.*

There is nothing to distinguish this case from the one under examination, except that in this, the words are "*issue* of the body", and in this there is a superadded limitation, viz: to the "heirs of such issue"; whereas, in that, the words were "*heirs* of the body", and there was no limitation superadded to those words. It is difficult to say, that the words "issue of the body" in this, may not be replaced by the words, "heirs of the body", without a change of the sense. The other difference was certainly insisted upon in the argument. And it is one which is doubtless not without value. The distributive direction was also relied upon. It does not appear on which ground the Court put its decision. It may, therefore, be insisted, that it placed it upon both. If so, the decision overrules, for the second time, the decision in *Doe ex D. Atkinson vs. Featherstone.*

Seeing, then, that this case of *Doe ex D. Atkinson vs. Featherstone* is not supported by a single other one, but is opposed by a great number of others, and those following each other through a long tract of time—some in the Common Pleas, some in the King's Bench, some in the Chancery; seeing that it is condemned by the rules of the best elementary writer on the subject, the case may be considered as not being of authority. On the contrary, the cases opposed to it, must be held to speak the Law.

These cases show a gift to A. for life, with remainder to the heirs of his body, to be equally divided among them; and without a limitation over, on a general failure of heirs, not to make an estate-tail in A., not to be within the rule in Shelly's case.

The cases for our decision, depend on a gift of this kind.— The deed of Nelson contains no limitation over, on a failure of the lawful heirs of the body of Elizabeth Adams, the daughter.

The conclusion, therefore is, that even *a part* of the words in this deed, which are superadded to the words "lawful heirs

of her body", viz : this part, " to. be *equally divided* among and between the lawful heirs of the body of the above named Elizabeth", is sufficient to control the legal import of those words, and so to take the deed out of the rule in Shelly's case.

But these superadded words are only a part of those contained in this deed of Nelson's. It contains others, those which declare that the persons meant by the expressions, " heirs of the body", were intended to take in *"fee simple"*.

Now, if the persons intended to take, were intended to take in fee simple, they could not have been intended to take in fee-tail—to take as " heirs of the body". Therefore, the words, "heirs of the body", were not intended to have their ordinary legal import. What other import can they have ? They cannot have the import of the words, " heirs general", so as to make the deed the same as it would be, were the words, to the son-in-law and daughter for life, remainder to her *heirs*, instead of to the heirs of her *body*. If they cannot have the ordinary legal import of the words heirs of the body, nor the import of the words heirs general, it follows that they cannot have any import which implies persons who are to take by *descent ;* but must have an import which implies persons who are to take by *purchase*.

Again. The gift in this deed, in the aspect in which we are at present viewing it, is, in substance, a gift to A for life, remainder, to the heirs of his body and their heirs, in fee simple.

Now if the words, " heirs of the body", be taken as words of limitation, the estate, in the ancestor A, will be an *estate-tail*—one to him and the heirs of his body ; and the rest of the estate, that is to say, *the reversion in fee,* will be in the donor. The property will pass from A down the line of the heirs of the body of A, until that line runs out—it will then revert to the donor, Nelson, or to his heirs.

But if the words engrafted upon the words " heirs of the body", viz : the words, " and their heirs in fee simple", are allowed to have effect, they will make the property take a different channel. They will make it pass from A to his heirs

general, whoever they may be, and will leave no *reversion* in the donor.

And when this is the case, as words must, if possible, be allowed to have their effect, the authorities are that the engrafted words control the words on which they are engrafted, and make them become words of purchase. Such was the case put by Anderson, viz : a limitation to the use of a man for life ; and after his decease, to the use of his heirs and *the heirs, female, of their bodies*. The principle is, that if the engrafted words would change the line of descent, as marked out by the words on which they are engrafted, the latter words are to be taken as words of purchase.

This is done by these latter engrafted words, in the deed of Nelson.

It follows, therefore, that even if *Doe ex Dem. Atkinson vs. Featherstone*, is to be considered as of authority, and so as nullifying the effect of a part of the super-added words in Nelson's deed, viz : the part which requires a *division* to be made among the heirs of the daughter's body, yet, the other part, viz : that which gives the property to those heirs in *"fee simple"*, is, of itself, sufficient to control the legal import of the words " heirs of the body", and make them words of purchase.

According, then, to the opinions of the best elementary writer, Fearne—according to the decisions of the Courts, the " super-added words", in this deed of Nelson's, are sufficient to show that he used the words " lawful heirs of the body" of his daughter, as words of purchase—as words synonomous with the word children or the word descendants.

This is the result, upon the assumption which we have made, that the property conveyed, is *realty* and not personalty.

But, in fact, that property is personalty.

Now, the rule in Shelly's case, by its terms, does not apply to gifts of personalty. Besides, such gifts, in the exposition of the rule in the case itself, are expressly excepted from the rule. (1 *Rep.* 104.)

But, then, instead, there has come to be adopted, with reference to gifts of personalty, a rule which practically amounts

nearly to the same thing.  That rule is, that if personalty be given in language which, if applied to realty, would create an estate-tail, it vests *absolutely* in him who would, if the property were realty, be the immediate donee in tail.

Still, each species of property has its own decisions for its government, and these decisions differ, in some respects.  The difference may be resolved into this : the decisions in reference to personalty, show a much greater disposition to consult the *real intention* of the donor, than do those in reference to realty.

This will become apparent, from a few cases to which I will advert.

The first is the case of *Jacobs and Ux. vs. Amyatt and others.*  (4 *Brown's Ch. R.* 542.)  The head note is " Devise of all the rest, &c. &c. of estate, both real and personal, unto A, to be placed at interest until her age of twenty-one years, or day of marriage, and then the whole, &c. &c. to be paid to her to and for her use during her natural life, and from and immediately after her decease, unto the heirs of her body, lawfully begotten, equally to be divided between them, share and share alike ; and in default of such issue, &c. is an estate for life".

Now, nothing is to be found here to prevent the words, " heirs of her body", from having their ordinary legal import, and so from being words of limitation, except the words of *division*.  There are, on the contrary, some other words which help to make them words of limitation—those which give the property *over*, "in default of such issue".  Yet, the Master of the Rolls, and afterwards, the Lord Chancellor, held the devise to create only an estate for life, in the first taker.  The Lord Chancellor said, " I admit the rule in *Doe vs. The Earl of Chatham*, that where personalty is so given, if the words would create a tenancy in tail, in land, it is absolute ; *but that rule has never been extended further than where the words create a clear estate-tail*".  The property was personalty.

This case, itself, would be sufficient to show the words, lawful heirs of the body, in Nelson's deed, to be words of purchase.

Against it no breath of objection has ever been breathed, as far as I know or believe, by any English Court.

To the same effect is *Wilson vs. Vansittant.* (*Amb.* 562.)

So a bequest to A, *for life,* and after his death, to his *issue,* he having no issue at the time of bequest, does *not* vest the absolute interest in A, even when there is a bequest over, on failure of the issue of A. This is established by the case of *Knight vs. Ellis.* (2 *Br. Ch. R.* 570.)

And yet, in such a case, the word issue is precisely of the same import as the words, heirs of the body.

So a " Bequest to testator's daughter and her children, and in default of such issue and in case of her death, to A and B, the limitation over takes effect on her dying without children". (1 *Jacob,* 346.)

To the same effect is *Stone vs. Maule.* (2 *Sim.* 490.)

These cases prove that in gifts of personalty, the intention of the giver is much more consulted than in gifts of realty; and they prove that in such a gift of personalty as this of Nelson's, the words lawful heirs of the body, are to be taken as words of purchase, synonomous with children or descendants.

4. If it was not the intention of Nelson, to use the words, lawful heirs of the body of his daughter, in the sense of descendants or children, then much of the deed is inoperative. If he intended his daughter and son-in-law to take absolutely, why did he say they were to take " during their existence in this world" ? Why did he say that at the daughter's death, the property was to be divided among the heirs of her body ? Why did he say that those heirs were to hold their shares in fee simple ? Why did he not barely say, I give the woman and her increase to my daughter and son-in-law ?

But according to the rules of construction, which we have taken from Blackstone, every part of a deed or will must be made to take effect, if possible.

Upon the whole, it seems to be safe to conclude, that it was Wm. Nelson's intention to use the words, heirs of the body, in the sense of descendants or children.

Eli Tucker and Reuben Tucker *vs.* Dennis Adams and others.

But, used in this sense, the word is a word of purchase, and not of limitation.

The defendants in error are the son and daughter, (and the daughter's husband,) of John and Elizabeth Adams. They, therefore, are the persons who were intended, by him, to take as purchasers.

There is nothing unlawful in such an intention as this.

The defendants in error, therefore, do take as purchasers.

This is the result, if the case was governed by the Law of England.

But the case is governed by the Law of Georgia. What, therefore, is the Law of Georgia, applicable to it?

The Law of Georgia is compounded of two parts—one English Law, which she adopted—the other Law of her own making. The English Law which she adopted, was such English Law as was "usually in force" within her borders on the 14th day of May, 1776, not being "contrary to the Constitution, Laws and form of Government" established by her as they existed on the 25th of May, 1784. (*Pr. Dig.* 570.)

What English Law was this? What is English Law? It is Statutes of Parliament and the Common Law. What is the Common Law? It is certain rules, of the existence of which, the decisions of the Courts are the chief evidence.

These decisions, in time, become also the main evidence of what is the meaning of Statutes.

It is not far from the truth, therefore, to say that, practically, the decisions of the Courts constitute the great body of the English Law, Statute and Common. And in answer to the question, what English Law was it that Georgia adopted? we may, in general, reply, she adopted the decisions of the English Courts. What decisions? Certainly only such as had been made at the time of adoption, not such as were to be made afterwards.

Might not some of the decisions, as they then stood, be wrong? They might; and of course such as were so were not adopted. But how is that to be found out by a Court of Georgia? By going backwards, not forwards; by going back to

VOL. XIV. 72

the evidence on which such decisions stand; by going back to the *older* decisions and writings on the Law. *Subsequent* English decisions cannot be received, to show them wrong, or received for any other purpose than to excite inquiry into the evidence on which such decisions stand. For this they may well be received.

And of the decisions in existence at the time of adoption, Georgia did not adopt all. She did not adopt any that were contrary to her " Constitution, Laws and form of Government", as then existing; she did not adopt any that " were not usually in force" on her inhabitants, on the 14th day of May, 1776.

Besides the Law which she adopted, Georgia has Law of her own making.

All this being so, what answer does the Law of Georgia—the whole compound of adoption and creation—give to the question, on the deed of Wm. Nelson? This resolves itself into the inquiry—

1. Which of the English decisions, bearing upon that question, if any, did Georgia adopt?

2. Did she, in fact, adopt any of them? had any of them been " usually in force" in Georgia, on the 14th of May, 1776? and if any had been, were they such as were not "contrary to the Constitution, Laws and form of Government" existing in Georgia, at the time of the Adopting Act, 25th February, 1784?

3. If Georgia, in fact, adopted any of them, has she modified such as she adopted by subsequent legislation?

Assuming, then, for the present, that Georgia adopted certain of the English decisions bearing on the question, in the deed of Nelson, which were they?

They could not be any of a date *subsequent* to the 14th day of May, 1776. They must have been such as were of a prior date.

Of all those of a prior date, the decisions in the case of Shelly, itself, and of *Doe ex Dem. Long vs. Laming*, may be regarded as good representations. Fearne's opinion, too, first

published in 1772, is not without its value.   These decisions, therefore, and the rule as laid down by Fearne, may stand for what Georgia adopted.

According to *these* decisions and *that rule*, the defendants in error took as *purchasers*, under the deed of Nelson.   This we have seen.

As to Shelly's case, the *decision* read by the joint light of *the rule, the facts* and *the argument* of counsel, on both sides, establishes that no construction is permissible, which would make super-added words *void*.   And in Nelson's deed, any construction which would not make the defendants in error take as purchasers, would render void the super-added words, which the deed contains.

According, then, to as much of the Law of Georgia, on this subject, as she adopted from England, if she adopted any, the defendants in error take as purchasers.

But it may be said that these decisions and this rule, thus adopted by Georgia, ought to be received as evidence of what the English Law is with distrust, inasmuch as decisions by the English Court, which differ from them, have been made since they were so adopted.   The effect of such subsequent decisions is, indeed, to make it prudent, if not necessary, for the Courts of Georgia to review the grounds of the older decisions, and see whether those decisions stand on a firm foundation.   Let us, therefore, briefly do this.

Now the foundation of the older decisions, viz: those of which Shelly's case, and *Doe ex Dem. Long vs. Laming* have been taken to be the representatives, is no doubt the rules of interpretation which we have quoted from Blackstone's Commentaries; and especially the two rules "that the construction be *favorable*, and as near the minds and apparent intents of the parties, as the rules of Law will admit", and "that the construction be made upon the entire deed, and not merely upon disjointed parts of it".   "And therefore, that every part of it be, (if possible,) made to take effect, and no word but what may operate in some shape or other".

Is not this a good foundation ?   Are not these two rules

sanctioned by the Law? Above all others, perhaps, they are. The older cases, then, stand upon a firm foundation.

Do the new cases not stand upon the same foundation? They do not. To support them, a new rule of construction had to be made. That rule is, that a donor's intent, in his conveyance, may be divided into two parts—general intent and particular intent—that particular intent yields to general intent—that words of descent, in the conveyance, such as "heirs of the body", express the general intent, and super-added words, the particular intent. That, therefore, super-added words are to be *rejected.*

That is to say, to get at the meaning of the conveyance, "the construction" is *not* to "be made on the entire deed", but on a part of it only, and the other part is to be annulled.

This is the rule by which the new cases of *Doe ex Dem. Jesson vs. Wright, Doe ex Dem. Candler vs. Smith,* 7 *Durn & E.* 532, *Doe ex Dem. Atkinson vs. Featherstone,* to all of which reference has been made, and some others were decided.

As the first of these was decided by the House of Lords, it deserves a fuller notice. That it shall now receive. This account is given of it in *Jarmon on Wills,* 280, 2d vol.

"A testator devised to W certain real estate, for the term of his natural life, he keeping the buildings in tenantable repair, and after W's decease, devised the same to *the heirs of the body of W,* lawfully issuing in such *shares and proportions* as W, by deed or will, *should appoint,* and for want of such appointment, then, to the heirs of the body of W, lawfully issuing share and share alike, as tenants in common; and if but one *child.* the whole to such only child; and for want of such issue, over".

The Court of King's Bench held this, to make W take an estate for life, with remainder to his children, for life, as tenants in common.

This decision of the King's Bench, the House of Lords, under the influence, apparently, of Lords *Eldon* and *Redesdale,* reversed.

Lord *Eldon* observed "It is definitively settled, as a rule of

Law, that where there is a particular and a general or paramount intent, the latter shall prevail, and Courts are bound to give effect to the paramount intent".

His Lordship then read the devise, observing that "If he stopped at the end of the devise to W, it was clear he was to take for life only; if at the end of the first following words "lawfully issuing", he would, notwithstanding the express estate for life, be tenant in tail; "and in order to cut down this estate", continued his Lordship, "it is absolutely necessary that a *particular* intent should be found, to control and alter it, as clear as the *general* intent here expressed". But his Lordship could find no such particular intent, in the subsequent words of the will. And it is quite manifest that if he could find no such intent in such words as were those in that will, he could find it in no words of any sort.

The practical effect, therefore, of the rule, as he *states* it and as he *applies* it, is that if by taking a clause or two in the first part of an instrument you can make out an intent to create an estate-tail, you are to call that the "general intent"; and if, after doing this, you find in the instrument any number of other clauses, which show an intent not to have created an estate-tail, by the first clause, you are to call that the particular intent; and then you are to say "that where there is a particular and a general intent, the latter shall prevail". You must be careful, however, of one thing. In hunting for the general intent, you must stop at the right place; you must go far enough, but not too far; you must not stop at the first clause, that which gives an estate to the first taker, expressly *for life*. It will not do to say the general intent was to give the *first* taker only an estate for *life*, and the remainder to other takers; you must go on to the next clause—"and after his decease, to the heirs of his body"; but beyond that do not go. That gives the first taker an *estate-tail*. It will be safe to say *this* was the general intent; therefore, say so. If you find other clauses, coming afterwards, utterly inconsistent with this view, say they merely manifest some particular intent; and therefore, must yield to the one single clause which manifested a general

intent. Beware of looking at the whole face of the instrument in one view, for the general intent or the particular intent. If you do that, you will find it difficult to say that the general intent—the *prime object*, was not to *prevent* an estate-tail in the first taker, instead of to create one. You will find it *impossible* to say that there could be any motive, *whatever*, for putting the greater part of the features in the face of the instrument—all the "grafted" ones, except that of preventing the first taker from taking an estate-tail. And you are to remember that you are to get not merely a general intent, but a general intent of the *right sort*, viz : one to create an *estate-tail ;* for, between you and me, that is all the use we have for this "general intent"—"particular intent" affair. This is Lord *Eldon's* Law.

Lord *Redesdale's* is not materially different. He says—" It cannot, at *this day*, be argued, that because the testator uses, in one part of his will, words having a clear meaning, in Law, and in another part, words inconsistent with the former, that the first words are to be cancelled or overthrown". But it could be and was so argued, in the day of Shelly's case, and for many long years afterwards ; nay, nearly up to the time when his Lordship spoke these words.

But his Lordship cannot quite stand the idea announced by Lord Eldon, " as definitively settled, as a rule of Law" that the general interest shall overrule the particular intent. He says, " That the general intent should overrule the particular, is *not the most accurate* form of expression". " The rule is, that technical words shall have their legal effect, unless from subsequent inconsistent words, it is very clear that the testator meant otherwise". So it is. But the difficulty with his Lordship is, that there can be " no subsequent inconsistent words" *inconsistent enough* to make it " very clear to him that the testator meant otherwise". For if the subsequent words in the case he was deciding were not sufficiently inconsistent for that purpose, what words could be ? His words *first* aforesaid best, no doubt, spoke his mind.

He goes on : " In many cases, *in all*, I believe, *except Doe*

*vs. Goff*, it has been held, that the words '*tenants in common*' do not overrule the legal sense of words of settled meaning". In this, his Lordship (in deference be it said,) simply errs.— There is a number of such cases as *Doe vs. Goff.* I have already noticed them in a previous part of this opinion. They are *Doe D. Long vs. Laming*, (2 *Burr.*) a great case. *Crump D. Woolley vs. Norwood*, (7 *Taunt.*); *Grettan vs. Harvard* (6 *do.*); *Doe D. Hallen vs. Ironmonger*, (3 *East.*); and *Doe vs. Goff itself*, (11 *East.*)

He adds, " It has been argued that heirs of the body cannot take as tenants in common ; but it does not follow that the testator did not intend that heirs of the body should take, because they cannot take in the mode prescribed". Does it not? The testator intends the persons to take, to be such persons as can take " as tenants in common", because his devise is " to the heirs", &c., " share and share alike, *as tenants in common*". Heirs cannot take as tenants in common. Therefore, (the conclusion would seem to be,) the persons he intended to take were *not heirs.* " This only follows", says his Lordship, " that, having given to heirs of the body, he would not modify that gift in the two different ways which he desired, and *the words of modification are to be rejected*". And here he strikes in with Lord Eldon. Read the will till you come to an estate-tail. There stop ; or if you read on, read to reject.

This rule is the foundation for those later cases. It is different from the rules on which the older cases rest. Therefore, it is not justified by those rules ; and as they were seen to be unquestionably sanctioned by the Law, it follows that this is not sanctioned by the Law. And such seems to be the final view taken of it, by the English Courts, and, indeed, by the English Parliament. It cannot be said that *Doe ex Dem. Jesson vs. Wright* has been acquiesced in. Sugden says :

" The arguments of Lord Eldon and Lord Redesdale have sometimes been thought not sufficiently *full* for such a case". " The Judges of B. R., it was understood, thought that the Judges ought to have been required to attend the hearing".— (*Sug. Law of Pow.* 251, *Note* 1.) The Judges of the King's

Bench, at the time its decision, in this case of *Jesson vs. Wright*, was overruled by the House of Lords, were Abbott, C. J., Holroyd, Bayley and Best, men of learning and ability. None of them was called upon by the House, to support the decision; but the case seems to have been entrusted to the legal hands of Lords Eldon and Redesdale, two Equity Lawyers, although the question involved in it, was eminently a purely legal one. Such an one as an Equity Lawyer—a Chancellor, in older times would hardly have felt himself competent to decide; but would have preferred to send for decision to a Court of Law—perhaps to that very Court of King's Bench, whose decision of it, in this case, was overruled by Chancellor influence—the influence of these two Equity Lords.

And the Courts have not followed it. In *Wilcox vs. Bellaers,* (*Turn. & R.* 495,); *Right vs. Creber,* (5 *Barn. & C.* 886); and *North vs. Martin,* (6 *Sim.* 266); and perhaps in *Greenwood vs. Rothwell,* (5 *Mann. & Gran.* 628,) to all of which I have referred in another place, they have as good as overruled it. So they have in *Lees vs. Mosley,* (1 *You. & Coll.* 589.)

And Parliament has, to a considerable extent, done the same, in the Statute of 1833, (3 *and* 4 *Will.* 4, *C.* 106,) which provides that when any land shall be divised to the heir of the testator, such heir shall be considered to take *as a devisee*, and not by descent : and the Statute of Wills of 1837, which declares that the words, "die without issue", and similar ones, shall be construed to mean a failure of issue in the life-time, or at the time of the death of the person referred to, and not to mean an indefinite failure of his issue; unless a contrary intention shall appear by the will, by reason of such person having a prior estate-tail; or of a preceding gift being without any implication arising from such words, a limitation of an estate-tail to such person, or issue, or otherwise. (1 *Jarm.* 68. 2 *do.* 763.)

The English decisions, therefore, which Georgia adopted, were those of which Shelly's case and *Doe ex Dem. Long vs. Laming,* may be taken as the representatives—there being no

sufficient reason from any subsequent English decisions, to say that these are not true exponents of the Law. And in accordance with this view, have been the decisions of the Courts of Georgia.

By those decisions, very slight "super-added" words to the word heirs, have been held to be sufficient to make that word a word of purchase. In *Carlton vs. Price*, the words were, "I give and bequeath to my son, Robert W. Carlton, during his natural life, and at his death, *to the lawfully begotten heirs of his body*, the following property: Aggy, a woman &c.— Nevertheless, if *the said Robert W. Carlton shall die without an heir*, then it is my desire that the above described and named negroes, and their increase, be set free at his death". (10 *Ga. R.* 496.) In this case, this Court seized hold of the words, "*at his death*", to control the legal effect of the words, "lawfully begotten heirs of his body". The Court say, "The bequest is restricted to such heirs of her son Robert, as might be in life, and capable of taking the property *at his death;* because she makes a *final disposition* of the property *at his death*, if no heirs of his body to take at *that time*, not at any *indefinite* period of time, after the death of her son Robert, who was the first taker".

This reason equally exists, in the case of Nelson's deed.— By it, the negro and her increase, *at the death* of the daughter and son-in-law, were to be equally divided between the heirs of the daughter's body, *and for their own use, in fee simple.* Here was a *final* disposition of the whole property, at the death of the first takers; and that, too, not (on a failure of *second* takers,) *by a limitation over to third takers*, but by a limitation to the second takers themselves, in *fee simple.*

So in *Atwells' Ex'rs. vs. Barney*, (*Dudley R.* 207,) John Atwell gave a negro woman to his daughter, Ellender, when she married; if she lived single, his executors to hire out the negro, and his daughter, Ellender, to receive the benefit thereof—*after her death, if no lawful issue*, to be divided amongst his children. The convention of Judges held the will to create no estate-tail; and the decision was put upon the same

ground as that upon which the decision in *Carlton vs. Price* was put, viz: the controlling influence which the words, "after her death" had upon the words, "if no lawful issue".

Besides *Carlton vs. Price*, there are quite a number of other cases, involving similar questions, decided by this Court, and with that case, they have all a general harmony.

If, therefore, Georgia adopted any of the English decisions, having a bearing upon such questions as this, which arises on the deed of Wm. Nelson, they were such of those decisions as were in existence on the 14th day of May, 1776, viz: such as Shelly's case, and the case of *Doe ex Dem. Long vs. Laming;* and according to those decisions, the defendants in error would take as purchasers, even if the property were realty.

The property, however, is personalty; and in the decisions of the English Courts, in reference to personalty, there is no conflict. The cases of *Jacobs & Wife vs. Amyatt and others*, and of *Knight vs. Ellis*, speak the unvarying voice of these Courts. What these cases speak, therefore, is what Georgia adopted as to personalty, if she adopted any English Law on the subject at all.

Be the property, in the deed of Nelson, therefore, realty or personalty, a Court of Georgia must say the defendants in error take it as *purchasers*.

But did Georgia adopt any of the English decisions at all, on this subject? Did Georgia adopt the rule in Shelly's case? and the rule in reference to personalty, growing out of the rule in that case?

In other words, were the rule in Shelly's case, and the rules growing out of it, such laws as had been "usually in force" in Georgia, on the 14th of May, 1776, and such as on the 25th of February 1784, were not "contrary to the Constitution, Laws, and form of Government" of Georgia, then existing?

The "Constitution" then existing, viz: that of 1777, contained this section:

"LI. Estates shall not be entailed, and when a person dies intestate, his or her estate, shall be divided equally among their children. The widow shall have a child's share or her dower,

at her option.    All other intestate's estates to be divided according to the Act of Distribution, made in the reign of Charles the Second, unless otherwise altered by any future Act of the Legislature".    (*Mar. & Craw.* 12.)

In 1785, the Legislature declared the true construction of this section to be, that "When any person, whatsoever, holding real and personal estate, shall depart this life intestate and without will, *the said estate, real and personal, shall be considered as being altogether of the same nature* and upon the same footing; so that in case of there being a widow and children or child, they shall draw equal shares thereof, unless the widow, &c., &c.    (*Watk. Dig.* 313.)

The meaning of this clearly is, that real property is to take the nature of personal, and not personal to take the nature of real.

By the Act of 1782, for opening the Courts of Law in Georgia, (*Watk. Dig.* 254,) and more especially by the Judiciary Act of 1789, (*Ib.* 391,) and all the subsequent Judiciary Acts, as well as by other Acts, realty was also put upon the same footing as personalty, with respect to liability to satisfy judgments against the owner.

Lands, equally with goods, had been subjected to attachment, from the earliest colonial times, viz: from 1761.    (*Ib.* 67.)

"And in cases of inter-marriage, since the 22d day of February, 1785, the *real estate* belonging to the wife, shall become vested in and pass to the husband, in the same manner as *personal property* doth".    (*Pr. Dig.* 225.)

In 1799, and again in 1805, the Legislature passed Laws by which executors and administrators are directed to make titles in performance of the condition, in bonds for title, to lands executed by their testators or intestates.    This shows that the Legislature considered the *title* to land to be in executors and administrators, and not in the heirs or next of kin.

The inference from this section of the Constitution of 1777, and from these Acts of the Legislature is, that in Georgia, at the time of the adopting Act, *realty* with respect to descent

and distribution, as well as to most, if not to all other things, had the *nature of personalty*.

In England, we have seen that the rule in Shelly's case does not apply to personalty, but only to realty; and why is this? Because there, as to *descent* and *distribution*, the nature of realty is different from that of personalty. Realty descends to and vests in the heir. Personalty passes to and vests in the executor or administrator; and from him it is distributed to the next of kin, or applied to the payment of debts or legacies. But in any case, the *title* is in him, and has to come from him, before it can go to any body else.

This being so, in a gift of personalty to A. for life, with remainder to his heirs, it is impossible, in England, to hold that the persons meant by the word heirs take by *descent*. They must take, if they take at all, as *purchasers*. They cannot take as heirs. " An heir is he upon whom the *law casts the estate, immediately* on the death of the ancestor; and an estate so descending to the heir, is called an inheritance". (2 *Black. Com.* 201.) If the estate be personalty, the Law does not cast it upon the heir, but upon the personal representative.

And what, in this respect, is true of personalty in England, must, it would seem, in Georgia be true, of both personalty and realty.

If this be so, and speaking for myself, I strongly incline to think that it is, then the rule in Shelly's case was not adopted by Georgia. At the time of the Adopting Act, that rule was one which was contrary to the Constitution and Laws then existing in the State.

If, however, the effect of the section of the Constitution, and of the parts of the Statutes to which I have referred, was not sufficient to prevent the adoption of the rule in Shelly's case, it was certainly sufficient to make the word ' heirs' in that rule more manageable—to make it more controllable by other words.

This word, in the plural, is a very stubborn one, in the English Law. According to that Law, " male issue shall be admitted before female"; and " where there are two or more

males, in equal degree, the eldest only, shall inherit. (2 *Black. Com.* 212, 214.) The word heirs, in the plural, therefore, means a series of single, isolated persons, living in periods of time *different*, if successive and contiguous—a series, therefore, none of whose units can take *jointly*, or take *distributively*, or take *in common*.

This being the legal import of the word, if land·be given to A. for life, with remainder to the heirs of his body, *jointly or equally to be divided among them*, or *as tenants in common*, the gift cannot, without the doing of great violence to the word ' heirs', be so construed as to create a joint tenancy, or a tenancy in common, or separate tenancies. The word has to be made to mean certain persons, who are at least *contemporaries*, and who cannot, therefore, be *heirs*. Construction has to make the word heirs import non-heirs. To do this, it must apply to the word a great degree of force. Force is to be derived from 'super-added' words. To effect the object, therefore, these must be strong.

In Georgia, on the contrary, the word heirs is one which may be easily controlled. It is one which has not the *kind* of meaning which it has in England. It does not mean persons upon whom "*the law* casts the estate, immediately on the death of the ancestor". In Georgia, upon the death of " the ancestor", the law casts the estate immediately upon *nobody ;* or if upon anybody, upon the personal representative. And it casts it upon him, to be administered, (if there are no debts to be paid,) by *distribution, to all of the next of kin* of the deceased, in equal degree. This is the general rule. In Georgia, therefore, the word heirs means *distributees ;* and the word *distributees* means *all the next of kin.* · Now, of persons constituting next of kin, there is always, potentially, a plurality, contemporaneously existing. Therefore, there is, in Georgia, always persons answering *to the legal meaning* of the term ' heirs', who may take jointly, or severally, or in common.—— Hence, to construe the term so as to make those meant by it so take, is to do no violence to it whatever.

But certainly it is not to do much violence to the term. The

expression, "heirs of the body of A", *includes* within its meaning *all* the children—*all* the descendants of A. *living at his death.* These, it undoubtedly includes. Admit that it includes others—that it includes all the descendants of these descendants, still, to restrict a word extending to many particulars, to some only of those particulars, does not require the exertion of so much force, as it does to make a word, signifying many particulars, cease to signify any of those particulars, and instead signify other and different particulars.

Therefore, to restrict the words, heirs of the body of A., to descendants of A., living at his death, in Georgia, requires a less force of super-added words than it does in England. In England, according to the conclusion to which we came, it does not require a greater force to do this, than is supplied by the words, "equally to be divided among them". Why then, in Georgia, should more be required than is furnished by words which say the estate is to be to A. for his life? I confess I do not see why. I strongly incline to think, that more is not required; and several other considerations help to give me this inclination.

1. Legislative interpretation. The Act of 1821, for construing conveyances, &c., (*Pr. Dig.* 246,) in its second section, declares, that "All gifts, &c., hereafter made, &c., *shall be held and construed* to vest in the person or persons to whom the same are made or executed, an absolute, unconditional fee simple estate, unless it be otherwise expressed, and a less estate mentioned and limited in such gift", &c. It is true, this is in terms prospective only; but still, it, as well as the whole Act, is solely for construction—for interpreting what itself was not to be changed; is a protest against a sort of construction which was prevailing—a sort by which, according to the Preamble of the Act, "The *intent* of parties to contracts and conveyances, is often defeated and great injustice done".

The Act, therefore, is evidence that the Legislature considered the prevailing kind of construction wrong, and another sort right, viz: that which should make a conveyance vest in the person to whom it might be made a fee simple, *unless* it

were " otherwise expressed", " and a *less estate mentioned and limited*". Of course this implies, that if a *less* estate were " mentioned and limited", then that was to be considered as meant.

Now, in a gift to A. *for life*, remainder to the heirs of his body, a *less estate* than an estate-tail *is mentioned*.

2. The Constitution, Laws and form of Government established in Georgia, at the time of the Adopting Act, if they spoke any one thing more than another, spoke this, that men ought to be allowed, more than they had been, to do as they please ; that private liberty is a good thing ; and therefore, that every construction should rather be in favor of such liberty than against it.

It follows, that a private man's wishes, *intentions*, were to be held sacred, unless clearly against Law.

Now, when a man gives an estate to A. for life, with remainder to the heirs of his body, is it *clear* that he intends something forbidden by Law, an estate-tail ? Rather, is it not pretty clear, that he intends what is not forbidden by Law, an estate for life only in A., with remainder to others, as purchasers ?

3. Especially when we remember, " That if the words will bear two senses, one agreeable to, and another against Law, that sense shall be preferred, which is most agreeable thereto".

4. The Act in relation to the limitation over, of estates, passed this year, 1854.

This Act declares, that limitations over, " after the death of the first taker, upon his or her dying without heirs", &c., " shall be held", &c., " to mean a definite failure of issue ; that is to say, a failure of issue or heirs, *at the time of the death of the first taker*".

This implies, that the word heirs, in the expression " dying without heirs", is to be understood, in the sense of children or descendants, living at the time of the death of the first taker ; and further, that if at that time, there be such children or descendants living, they shall take as purchasers.

Now this Act, equally with the Act of 1821, is an Act of

mere construction—is a legislative declaration of what the Legislature deems the Law already to be.

Upon the whole, therefore, I am. not satisfied that Georgia ever adopted the rule in Shelly's case.

3. If she did, it is not worth while to prosecute the inquiry., as to whether she has modified the rule by legislation, subsequent to the adoption. That has already been sufficiently done for these cases.

The general conclusion is, that the defendants in error take as purchasers; and that the judgments of the Court below, so declaring, ought to be affirmed.